**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2000
_____

BRITTANY MORROW; EMILY MORROW,
Minors, In Their Own Right, And By Their Parents
and Natural Guardians, Bradley Morrow and Diedre Morrow;
BRADLEY MORROW; DIEDRE MORROW, Individually,
Appellants

v.

BARRY BALASKI, Individually; THE BLACKHAWK
SCHOOL DISTRICT

_____

On Appeal from the District Court
for the Western District of Pennsylvania
(No. 2:10-cv-00292)
Chief Magistrate Judge Lisa Pupo Lenihan
_____

Argued on October 10, 2012

Before: McKEE, *Chief Judge*, SLOVITER, SCIRICA,
RENDELL, AMBRO, FUENTES, SMITH, FISHER,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
VANASKIE and NYGAARD, *Circuit Judges*.

(Opinion Filed: June 05, 2013)

Albert A. Torrence, Esq.    **(ARGUED)**
640 Fourth Street
Beaver, Pennsylvania 15009
    *Attorney for Appellants*

Charles W. Craven, Esq.    **(ARGUED)**
John J. Hare, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103

Scott G. Dunlop, Esq.
Teresa O. Sirianni, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin
600 Grant Street
2900 U.S. Steel Tower
Pittsburgh, PA 15219
    *Attorneys for Appellees*

_____

OPINION OF THE COURT
_____

McKEE, *Chief Circuit Judge*, with whom SLOVITER, SCIRICA, RENDELL, AMBRO (joins Section III B of the majority only), SMITH, FISHER, CHAGARES, HARDIMAN, and GREENAWAY, JR., *Circuit Judges* join.

As is so often the case, the issues in this appeal arise from unsettling facts presented by sympathetic plaintiffs.[1] We are asked to decide whether public schools have a constitutional duty to protect students from abuse inflicted by fellow students under the circumstances alleged here.

Appellants, Brittany and Emily Morrow, and their parents, Bradley and Diedre Morrow, brought this action against Blackhawk School District and Blackhawk High School's Assistant Principal, Barry Balaski.[2]  The Morrows

_____

[1]  See *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1365 (3d Cir. 1992) (en banc), wherein Judge Seitz noted that such cases as this present "a classic case of constitutional line drawing in a most excruciating factual context."

[2]  We will refer to the Blackhawk School District and Assistant Principal Balaski collectively as the "Defendants."

claim that Brittany and her sister Emily were subjected to bullying in the form of a series of threats, assaults, and acts of racial intimidation at the hands of a fellow student and her accomplice. Unable to obtain help from school officials, the Morrows were ultimately compelled to remove their children from their school. Thereafter, the Morrows brought suit alleging that school officials denied them substantive due process under the Fourteenth Amendment by not protecting Brittany and Emily. The Third Amended Complaint (the "Complaint") asserted a cause of action under 42 U.S.C. § 1983 and a supplemental state law claim for "negligence and/or gross or willful misconduct."

The District Court dismissed the Complaint based on our decision in *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992) (en banc). There, we concluded that the school did not have a "special relationship" with students that would give rise to a constitutional duty to protect them from harm from other students given the alleged facts. *See id.* at 1372 (finding that "no special relationship based upon a restraint of liberty exists here"). The District Court also held that the injury the Morrows complained of was not the result of any affirmative action by the Defendants. Accordingly, the court held that the Defendants are not liable under the "state-created danger" doctrine. The District Court therefore dismissed the Morrows' Complaint, and this appeal followed. The appeal was initially argued before a panel of this Court. Thereafter, we granted *en banc* review to reexamine the very important questions raised by the allegations in the Complaint.

We now affirm the judgment of the District Court and hold that the allegations do not establish the special relationship or the state-created danger that must exist before a constitutional duty to protect arises under the Fourteenth Amendment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

3

Brittany and Emily Morrow attended Blackhawk High School in Beaver County, Pennsylvania.[3] Beginning in January 2008, they were subjected to a series of threats and physical assaults by Shaquana Anderson, a fellow student. Specifically, on January 5, 2008, Anderson threatened Brittany by phone and on a MySpace blog.[4] Two days later, Anderson physically attacked Brittany in the school's lunch room. Pursuant to its "No Tolerance Policy," the school suspended both girls for three days. Brittany's mother also reported Anderson to the local police at the recommendation of Assistant Principal Balaski. As a result, Anderson was charged with simple assault, terroristic threats, and harassment. Nevertheless, Anderson continued to bully Brittany and Emily. In fact, shortly after she returned to school, Anderson again attacked Brittany by attempting to throw her down a set of stairs. During that incident, Anderson allegedly called Brittany a "cracker," told her that she was "retarded" and "had better learn to fight back," and asked "why don't you learn to talk right?"

On April 9, 2008, Anderson was placed on probation by the Court of Common Pleas of Beaver County, Juvenile Division, and ordered to have no contact with Brittany. Five months later, Anderson was adjudicated delinquent by a Juvenile Master of that court, and was again ordered to have no contact with Brittany. Copies of both of these "no-contact" orders were provided to the school and to Assistant Principal Balaski.

---

[3] Since this is an appeal from the District Court's grant of the Defendants' Motion to Dismiss pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, we must accept the factual allegations contained in the Morrows' Complaint as true. *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

[4] "MySpace" is a popular social-networking website that "allows its members to create online 'profiles,' which are individual web pages on which members post photographs, videos, and information about their lives and interests." *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 845 (W.D. Tex. 2007).

Despite the court's intervention, on September 12, 2008, Anderson boarded Brittany's school bus, even though that bus did not service Anderson's home route. Anderson threatened Brittany, and she elbowed Brittany in the throat at a school football game that evening. A few days later, Abbey Harris, Anderson's friend, struck Emily in the throat. These incidents were reported to school officials.

The Morrows subsequently met with school officials, but they responded by telling the Morrows that they could not guarantee Brittany and Emily's safety. Instead, rather than removing Anderson and her confederate from the school, school officials advised the Morrows to consider another school for their children. In October 2008, the Morrows enrolled their daughters in a different school.

## B. Procedural History

The Morrows thereafter filed this suit pursuant to 42 U.S.C. § 1983, alleging a violation of their Fourteenth Amendment substantive due process rights.[5] They also included a supplemental state law claim against Assistant Principal Balaski for "negligence and/or gross and willful misconduct." The Morrows acknowledge that the Fourteenth Amendment's Due Process Clause does not generally impose an affirmative duty on the state to protect individuals from harm caused by private citizens. However, they argue that the general rule is not applicable because the Defendants had a "special relationship" with Brittany and Emily. They also argue that the Defendants are liable because they created the dangerous situation in which Brittany and Emily found themselves, and that circumstance gave rise to a duty to protect the Morrow sisters from that danger.

The District Court dismissed the Morrows' Complaint with prejudice, and declined to exercise supplemental jurisdiction over the state law claim.[6] In its written opinion,

---

[5] The Morrows seek: 1) compensatory damages as to all Defendants; 2) punitive damages as to defendant Balaski; and 3) attorneys' fees.

[6] Because the District Court dismissed the Complaint with prejudice, it was not necessary for the court to reach the

the District Court explained that we have held that there is no special relationship between public school authorities and students. The court also concluded that the Morrows had "identified no action of the Defendants that utilized their authority in a way that rendered Minor Plaintiffs more vulnerable than they would have been otherwise." *Morrow v. Balaski*, No. 10-cv-292, 2011 WL 915863, at \*5 (W.D. Pa. Mar. 16, 2011). Although the District Court noted that it was "sympathetic to Plaintiffs' plight," it nevertheless concluded that the Morrows "have not stated a cause of action under current Third Circuit case law." *Id.*

This appeal followed.[7]

## II. STANDARD OF REVIEW

Our review of a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) is plenary. *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163 (3d Cir. 2010). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011). Although we must accept the allegations in the complaint as true, "we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations and internal quotation marks omitted).

## III. DISCUSSION

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States. *Nicini v. Morra*, 212 F.3d 798,

---

issues of municipal liability and qualified immunity that the Defendants raised in their Motion to Dismiss.

[7] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

806 (3d Cir. 2000) (en banc). Accordingly, "[t]he first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to [then] determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998)).

As we noted at the outset, the Morrows' § 1983 claim rests on the Due Process Clause of the Fourteenth Amendment. The Due Process Clause provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Morrows invoke the substantive component of due process, which "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Specifically, the Morrows allege that school officials violated a liberty interest by failing to protect Emily and Brittany from the threats and assaults inflicted by fellow students.

Like the District Court, we are sympathetic to the Morrows' plight. Brittany and Emily were verbally, physically and—no doubt—emotionally tormented by a fellow student who was adjudicated delinquent based on her actions against the Morrow sisters. When the Morrows requested that the Defendants do something to protect Brittany and Emily from the persistent harassment and bullying, school officials responded by suggesting that the Morrows consider moving to a different school rather than removing the bully from the school.

We therefore certainly understand why the Morrows would conclude that the school's response to the abuse inflicted on their daughters was unfair and unjust. Nevertheless, our adjudication of the Morrows' claims must be governed by Supreme Court precedent. As we shall explain, it is also guided by authoritative Supreme Court *dicta*.

The Supreme Court has long established that "[a]s a general matter, . . . a State's failure to protect an individual

against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989). The Due Process Clause forbids the state *itself* from depriving "individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195.

In *DeShaney*, the Winnebago County Department of Social Services received ongoing reports from family friends and medical personnel that a four-year old boy ("Joshua") was suffering physical abuse at the hands of his father. At one point, the state obtained a court order placing Joshua in the temporary custody of the local hospital, but later returned him to the custody of his abusive father. Following Joshua's return, the county social worker assigned to the case continued to document multiple incidents of suspected abuse. Despite these reports, the county failed to remove Joshua from his father's custody. Eventually, the father beat Joshua so badly that the boy suffered permanent brain damage. Joshua and his mother sought redress by suing the county under § 1983. They argued that the county had denied them substantive due process under the Fourteenth Amendment by not protecting Joshua from his father. *Id.* at 191-93.

Despite these "undeniably tragic" facts, *id.* at 191, the Supreme Court held that the county's failure to provide Joshua with adequate protection against his father's violence did not amount to a substantive due process violation. The Court explained that the Due Process Clause limits state governments but does not generally impose an affirmative obligation upon states to protect individuals from private citizens. *Id.* at 195-96. However, the Court carved out a very narrow exception to that general rule wherein the Constitution does "impose[] upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. That exception has come to be known as the "special relationship" exception. It applies when a special relationship has been established because "the State takes a person into its custody and holds him there against his will." *Id.* at 199-200.

8

In addition to the special relationship exception, we have recognized that the Due Process Clause can impose an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury. *See Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996). In *Kneipp*, police officers stopped Kneipp and her husband for causing a disturbance on a highway while they were walking home from a bar, but they thereafter allowed Kneipp's husband to continue to their home to tend to their son. Kneipp's husband later testified that because his wife was drunk, he assumed the officers would take her to the hospital or to the police station. However, the officers abandoned her despite her obvious intoxication, thereby forcing her to walk home alone in the cold. She subsequently fell down an embankment and suffered hypothermia resulting in permanent brain damage. *Id.* at 1201-03. In the subsequent suit against the state under § 1983, we held that the officers' conduct denied Kneipp her Fourteenth Amendment right to substantive due process because the actions of the police created the danger that caused her injury. *Id.* at 1213.

Accordingly, the Morrows can state a claim under § 1983 if they have adequately alleged circumstances giving rise to a "special relationship" between their daughters and the Defendants pursuant to *DeShaney*, or if their Complaint adequately alleges affirmative conduct on the part of the Defendants to support the "state-created danger" exception that we adopted in *Kneipp*.

## A. Special Relationship

As the Court instructed in *DeShaney*, an affirmative duty to protect may arise out of certain "special relationships" between the state and particular individuals. *See DeShaney*, 489 U.S. at 197-98. The Supreme Court has found that the relationship between the state and its incarcerated or involuntarily committed citizens is the kind of "special relationship" that creates an affirmative duty upon the state to provide adequate medical care to incarcerated prisoners, *see Estelle v. Gamble*, 429 U.S. 97, 103 (1976), and to ensure the "reasonable safety" of involuntarily committed mental patients, *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). *Estelle* and *Youngberg*, "[t]aken together . . . stand . . . for the

proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200.

It is clear from the decision in *DeShaney* that the state's constitutional "duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200. In other words, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraint of personal liberty*—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* (emphasis added).

A minor child attending public school most certainly does not have the freedom of action or independence of an adult.[8] Nevertheless, the Supreme Court has not had occasion to specifically decide whether that is sufficient to create a special relationship between public schools and their students under the Due Process Clause. We have, however, previously considered the application of the special relationship doctrine in the public school context. In *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992), a sixteen-year-old hearing and communication-impaired student ("D.R.") and a seventeen-year-old classmate ("L.H.") alleged that several male students physically, verbally, and sexually assaulted them during a graphic arts class during the school day over a period of several months. The male students forced them into the classroom's unisex bathroom or darkroom and physically abused and sexually molested the plaintiffs multiple times per week. A student teacher was

---

[8] "[T]he preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985).

present in the classroom when the abuses occurred. Although D.R. did not claim to have informed her of the situation, D.R. alleged that the teacher either heard the assaults or should have heard them. L.H. alleged that she complained to the school's assistant director about the boys' conduct, but he took no action. *Middle Bucks*, 972 F.2d at 1366.

Although we recognized the horrific nature of the allegations, we nevertheless held that "the school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney*." *Id.* at 1372. We rejected the plaintiffs' argument that Pennsylvania's compulsory school attendance laws and the school's exercise of *in loco parentis* authority over its students so restrain the students' liberty that they can be considered to have been in state "custody" during school hours for Fourteenth Amendment purposes. *Id.* at 1370-72. Our conclusion was largely informed by the fact that "parents remain the primary caretakers, despite their [children's] presence in school." *Id.* at 1371. We explained that "[t]he *Estelle-Youngberg* type custody referred to by the Court in *DeShaney* . . . is to be sharply contrasted with D.R.'s situation." *Id.* Although the doctrine of *in loco parentis* certainly cloaks public schools with some authority over school children, *see, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 413-14 (2007) (reviewing legal doctrine of *in loco parentis*), that control, without more, is not analogous to the state's authority over an incarcerated prisoner or an individual who has been involuntarily committed to a mental facility.

Nonetheless, when we decided *Middle Bucks*, the Supreme Court's jurisprudence allowed room to debate this issue because the Court had not enumerated the parameters of the control or custody required for the creation of a special relationship under the Fourteenth Amendment. Accordingly, in a compelling dissent to the *Middle Bucks* majority, then-Chief Judge Sloviter argued for a "functional" approach to "custody":

> I believe that we are free to decide . . . that the state compulsion that students attend school, the status of most students as minors whose

11

judgment is not fully mature, the discretion extended by the state to schools to control student behavior, and the pervasive control exercised by the schools over their students during the period of time they are in school, combine to create the type of special relationship which imposes a constitutional duty on the schools to protect the liberty interests of students while they are in the state's functional custody.

*Middle Bucks*, 972 F.2d at 1377 (Sloviter, C.J., dissenting, joined by Mannsmann, Scirica and Nygaard, JJ.); *see also Maldonado v. Josey*, 975 F.2d 727, 733 (10th Cir. 1992) (Seymour, J., concurring) ("I would . . . hold that a child legally required to attend school and thereby forced into the temporary day-time custody of the state's agents is constitutionally entitled to some level of protection from harm and care for basic safety.").

However, after our decision in *Middle Bucks*, the Supreme Court decided *Vernonia School District 47J v. Acton*, 515 U.S. 646 (1995). There, the Court clarified the applicability of *DeShaney*'s special relationship exception in the context of public schools. The specific issue in *Vernonia* was whether a public school's policy requiring student athletes to submit to random drug testing violates the Fourth Amendment. *Id.* at 648. In holding that such a policy does not violate the Fourth Amendment, the Court noted: "Central, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." *Id.* at 654. The Court then stated: "[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" *Id.* at 655 (citing *DeShaney*, 489 U.S. at 200).

Although that statement is technically *dictum*, we have previously explained that we cannot lightly ignore the force of Supreme Court *dicta*. *See In re McDonald*, 205 F.3d 606, 612-13 (3d Cir. 2000).[9] Moreover, although the statement

_____

[9] In *In re McDonald*, we explained:

12

was made in the context of the Court's analysis of a student athlete's reasonable expectation of privacy in public schools, the citation to *DeShaney* is no less pertinent to our inquiry because it provides insight into the Court's interpretation of *DeShaney*'s application to public schools. Indeed, short of an actual holding on the precise issue here, it is difficult to imagine a clearer or more forceful indicator of the Court's own interpretation of *DeShaney* and the special relationship exception recognized there as applied to public schools. *See id.* ("The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket.").

In addition, every other Circuit Court of Appeals that has considered this issue in a precedential opinion has rejected the argument that a special relationship generally exists between public schools and their students. *See, e.g.*, *Hasenfus v. LaJeunesse*, 175 F.3d 68, 69-72 (1st Cir. 1999); *Doe v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 857-58, 863 (5th Cir. 2012) (en banc); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509-10 (6th Cir. 1996); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 268, 272-73 (7th Cir. 1990); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 731-33 (8th Cir. 1993); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 972-74 (9th Cir. 2011); *Maldonado v. Josey*, 975 F.2d 727, 729-33 (10th

---

> [E]ven if the discussion . . . could be accurately characterized as dictum[,] . . . we should not idly ignore considered statements the Supreme Court makes in dicta. . . . Appellate courts that dismiss these expressions in dicta and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there.

*Id.* at 612-13 (citation and internal quotation marks omitted).

Cir. 1992); *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 568-69 (11th Cir. 1997).[10]

Accordingly, the Supreme Court's *dictum* in *Vernonia* as well as the consensus from our sister Circuit Courts of Appeals both reinforce our conclusion that public schools, as a general matter, do not have a *constitutional* duty to protect students from private actors. We know of nothing that has occurred in the twenty years since we decided *Middle Bucks* that would undermine this conclusion. We therefore find the dissent's assertion here that "factual developments since *Middle Bucks* have further undercut its rationale," Fuentes Dissent 18, unpersuasive. The first two examples our dissenting colleagues offer of "schools exercising greater control over students" include the use of technology tracking student movement to ensure they are in class[11] and the monitoring of social media activity by students.[12] *Id.* Such examples merely illustrate new precautionary measures some schools have undertaken in response to emerging technology. It is difficult to see how such measures constitute limitations on a student's "freedom to act on his own behalf," *see DeShaney*, 489 U.S. at 200, that are so severely restrictive as to equate public school students with prisoners or those who are involuntarily committed to secure mental institutions.

Similarly, a school's exercise of authority to lock classrooms in the wake of tragedies such as those that have

---

[10] The Court of Appeals for the Second Circuit has not squarely decided this issue. However, district courts in the Second Circuit have generally held that compulsory attendance laws do not create a special relationship between students and school districts resulting in a duty to protect against private actors. *See, e.g.*, *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 763 n. 10 (S.D.N.Y. 2011) ("The consensus among the courts is that the 'special relationship' doctrine does not apply to the school setting.").

[11] Fuentes Dissent 18 (citing Maurice Chammah and Nick Swartsell, *Student IDs That Track the Students*, N.Y. TIMES, OCT. 6, 2012, http://nyti.ms/ThvbFq).

[12] *Id.* (citing *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 915 (3d Cir. 2011)).

occurred in Newtown, Connecticut and Colombine, Colorado, *see* Fuentes Dissent 18-19, may be a relevant factor in determining whether a special relationship or a state-created danger exists in those specific cases. However, the fact that *certain* schools may resort to such restrictions does not advance our inquiry here or allow us to conclude that the facts alleged in the Complaint are sufficient to give rise to a special relationship or a state created danger.

In arguing that we should find a special relationship here, Judge Fuentes cites to Judge Becker's statement in dissent in *Middle Bucks* that "a special relationship [between a public school and its students] may exist under certain narrow circumstances." Fuentes Dissent 3. We do not disagree. In holding that public schools do not generally have a constitutional duty to protect students from private actors and that the allegations here are not sufficient to establish a special relationship, we do not foreclose the possibility of a special relationship arising between a *particular* school and *particular* students under certain unique and narrow circumstances. However, any such circumstances must be so significant as to forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administrators as part of the school's traditional *in loco parentis* authority or compulsory attendance laws.

The circumstances that our dissenting colleagues rely upon to insist that a special relationship exists under the facts alleged here are not "certain narrow" circumstances at all. Instead, they are endemic in the relationship between public schools and their students. The dissent would hold that a special relationship exists such that "Blackhawk undertook a limited obligation to keep the Morrows safe . . . because Blackhawk compelled school attendance, exercised extensive control over not only the student victims but also the specific threat at issue in the case—a violent bully subject to two restraining orders—and enforced school policies that prevented the Morrows from being fully able to protect themselves." Fuentes Dissent 3. However, those factors do not distinguish the circumstances here from those that arise in the general relationship between public schools and their students.

15

As discussed above, we cannot hold that a special relationship arose from compulsory school attendance laws and the concomitant *in loco parentis* authority and discretion that schools necessarily exercise over students, or the school's failure to do more to protect Brittany and Emily, without ignoring the analysis in *DeShaney*, and the "considered dicta" in *Vernonia School District*. In arguing to the contrary, our dissenting colleagues exaggerate the extent of a school's control over its students. Judge Fuentes insists that "[t]he State's authority over children while they are in school extends beyond their well-being and *is nearly absolute*." Fuentes Dissent 9 (emphasis added). However, the mere fact that a school can require uniforms, 24 Pa. Stat. Ann. § 13-1317.3, or prescribe certain behavior while students are in school, 22 Pa. Code § 12.2, does not suggest a special relationship at all. Rather, such commonly accepted authority over student conduct is inherent in the nature of the relationship of public schools and their pupils.[13] They do not suggest that a concomitant constitutional duty to protect students necessarily arises from that authority.

Significantly, our dissenting colleagues do not purport to argue that compulsory attendance laws and the school's authority over students are themselves sufficient to satisfy the limited exception carved out in *DeShaney*. Thus, the dissent attempts to characterize the specific circumstances of this

---

[13] Moreover, the generic responsibilities and authority prescribed by state law are not nearly as compelling and authoritarian as our dissenting colleagues suggest. For example, Judge Fuentes cites 22 Pa. Code § 12.2 in arguing that state law requires that students "engage in conscientious effort in classroom work and homework." Fuentes Dissent 9. However, it is doubtful that parents or students really fear that the awesome authority or weight of the state will come crashing down upon students who do not hand in homework or conscientiously participate in class. It is also not at all clear how the state's authority to require such "conscientious effort" restricts parents' ability to protect their children, or the students' ability to protect themselves, while in school.

16

case as so extraordinary and compelling that a constitutional duty to protect arose under *DeShaney.* We are not persuaded.

The fact that "the specific threat at issue in this case" was "a violent bully subject to two restraining orders," Fuentes Dissent 3, does not necessarily give rise to a special relationship. The restraining orders to which the dissent refers were addressed to Anderson, not the Defendants, and the orders themselves do not impose any affirmative duties on the Defendants. Indeed, we very much doubt that any Defendant was a party to the proceedings that resulted in the orders, and no such involvement has been alleged. Although the Defendants, and other third parties, are prohibited from making contact with the Morrow children *on Anderson's behalf*, the no-contact orders cannot reasonably be interpreted as imposing any obligation on the Defendants to ensure Anderson's compliance with the orders or to otherwise enforce them. *Cf. Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (holding that police department's failure to enforce restraining order did not constitute a violation of due process under the Fourteenth Amendment).

Moreover, whether our dissenting colleagues are referencing the school's "No Tolerance Policy," or the policy that allegedly required Anderson's expulsion from school, in arguing that the Defendants "enforced school policies that prevented the Morrows from being fully able to protect themselves," Fuentes Dissent 3, neither the mere existence of such common disciplinary policies, nor the school's exercise of discretion in enforcing them, altered the relationship between the school and its students to the extent required to create a constitutional duty under the Supreme Court's precedent.[14]

---

[14] Indeed, Judge Fuentes's suggestion that the school's "No Tolerance Policy" limited "the Morrows' ability to protect themselves," Fuentes Dissent 14, is both unavailing and troubling. The manner in which the school interpreted and enforced the policy here is certainly open to question as it appears Brittany was suspended for resisting Anderson's attack. However, that does not begin to approach the kind of restriction on freedom required to give rise to a special relationship under *DeShaney.* Were we to accept Judge

17

The Morrows' attempt to distinguish their situation based on the Defendants' "actual knowledge of Anderson's criminal conduct in this case" is similarly unpersuasive. They argue that such knowledge, combined with "the quasi-custodial relationship that exists in all cases between a public school and its pupils," created a special relationship for substantive due process purposes.

*DeShaney* suggests otherwise. Neither our decision in *Middle Bucks*, nor the *dictum* in *Vernonia*, necessarily forecloses the possibility of a special relationship arising in an appropriate case. However, the Court has instructed that any such relationship "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200. Thus, under *DeShaney*, the Defendants' knowledge—of both the no-contact orders and Anderson's threats and conduct—may be relevant to determining whether the Defendants' conduct was sufficiently egregious to violate a previously existing duty to protect the Morrow children, but that knowledge cannot create a duty that did not otherwise exist.

To find a special relationship here, our dissenting colleagues rely, in part, on our analysis in the foster care context in *Nicini v. Morra*, 212 F.3d 798 (3d Cir. 2000) (en banc). *See* Fuentes Dissent 10. However, we explained there that "distinctions between children placed in foster care and the prisoners at issue in *Estelle* or the institutionalized mentally retarded persons at issue in *Youngberg* are matters of degree rather than of kind. In each of these cases the state, by affirmative act, renders the individual substantially 'dependent upon the state . . . to meet [his or her] basic needs.'" *Id.* at 808 (alteration in original) (citation omitted) (quoting *Middle Bucks*, 972 F.2d at 1372). By "'finding the children and placing them with state approved families . . . ,

---

Fuentes's proposition, school policies prohibiting the carrying of weapons or even cellular telephones at school could theoretically also give rise to a constitutional duty to protect because such policies can also be interpreted as limiting students' ability to protect themselves.

the state assumes an important continuing, if not immediate, responsibility for the child's wellbeing.'" *Id.* (quoting *Middle Bucks*, 972 F.2d at 1372).[15]

As we explained in *Middle Bucks*, unlike children in foster care, students in public schools continue to be primarily dependent on their parents for their care and protection, not on their school. Despite the students' compulsory attendance in school during the school day and the school's authority to act *in loco parentis* during that time, the school's authority and responsibility neither supplants nor replaces the parent's ultimate responsibility for the student absent more than is alleged here. Unlike foster care, the restrictions that schools place on students generally, and the specific restrictions alleged here, are different *in kind* from the restrictions faced by the prisoners at issue in *Estelle* or the institutionalized persons in *Youngberg*.

This point is illustrated by the fact that schools generally may not administer medical treatment to students without first obtaining parental consent. *See Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 646 A.2d 689, 691 (Pa. Commw. Ct. 1994) ("The principle that parental consent must be secured before [schools may provide] medical treatment . . . is time honored and has been recognized by both the courts and the legislature."). In

---

[15] The foster care cases from other circuits cited by Judge Fuentes also turn on the fact that the state had displaced the parents' role as primary caregiver and transferred such responsibility to the foster family, an agent of the state. *See e.g.*, *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993) ("In this case, a special custodial relationship . . . was created by the state when it took Taureen from his caregiver and placed him in foster care. . . . In foster care, a child loses his freedom and ability to make decisions about his own welfare, and must rely on the state to take care of his needs. It cannot be seriously doubted that the state assumed an obligation to provide medical care."); *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir. 1992) ("[I]f the persons responsible place children in a foster home or institution they know or suspect to be dangerous to the children[,] they incur liability if the harm occurs.").

contrast, when a minor enters foster care, state actors have the authority to bypass parental consent by obtaining a court order authorizing medical treatment. *See* 55 Pa. Code §§ 3130.91, 3800.19(b); 42 Pa. Stat. Ann. § 6357 (stating that the custodian, to whom legal custody of a child has been given by the Court of Common Pleas under the Juvenile Act, has "the right to determine the nature of the care and treatment of the child, including ordinary medical care").[16] When a state agency has custody of a minor child for whom a decree of termination of parental rights has been entered, the agency acquires authority to consent to all medical examination or treatment, including major medical, psychiatric and surgical treatment of the minor even without obtaining a court order. *See* 23 Pa. Stat. Ann. § 2521(c).

The dissent's citation to *Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005), is also unavailing. In *Smith*, the court found a special relationship between the District of Columbia and "an adjudicated delinquent whom the District had, by affirmative exercise of its police power, placed with its agent, [an independent living program], through a court order revocable only by another court order." *Id.* at 94. The dissent argues that "[l]ike the children in *Smith*, the Morrows were technically free to 'come and go' from school after certain hours but 'risk[ed] punishment' for 'fail[ing] to obey [the State's] restrictions on [their] . . . freedom' while in school." Fuentes Dissent 13 (alterations in original) (quoting *Smith*, 413 F.3d at 94). However, the fact that the juvenile in *Smith* enjoyed a degree of freedom of movement while housed at the independent living program is not determinative. The state's liability arose from the fact that

---

[16] *See also* Lordes M. Rosado, *Consent to Treatment and Confidentiality Provisions Affecting Minors in Pennsylvania*, Juvenile Law Center, Jan. 2006, at 13, *available at* http://www.jlc.org/resources/publications/consent-treatment-and-confidentiality-provisions-affecting-minors-pennsylvani ("As a matter of practice, upon accepting a new child for services, private [foster care] agencies have the child's parent/guardian sign a general release authorizing the agency to obtain routine medical examination and treatment for the child. The private agencies in turn authorize the foster parent to obtain [such treatment] for the children.").

the state, through court order, had removed the juvenile from the care and custody of his parents and required him to live under the care and custody of the independent living program, which was acting as the state's agent under a very detailed contract between the program and the state.

In *DeShaney*, the Supreme Court expressly noted that "[h]ad the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *DeShaney*, 489 U.S. at 201 n.9. That is precisely what happened in *Nicini*; it is not what happened here. Moreover, the Court acknowledged in *DeShaney* that "several Courts of Appeals have held, by analogy to *Estelle* and *Youngberg*, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes." *Id.* Citing this footnote, the court in *Smith* found that the independent living program there "presents a scenario close to the one described in the *DeShaney* footnote." *Smith*, 413 F.3d at 94.

The dissent contends that this "focus on who remains the victim's primary caregiver . . . contrast[s] sharply with our holding in *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989)." Fuentes Dissent 6 n.3. We agree that the facts of *Horton* are instructive, but believe that they clearly counsel against imposing a constitutional duty here.

In *Horton*, the owner of a nightclub suspected an employee, Powdrill, of burglarizing the club. The owner and another employee began interrogating Powdrill about the burglary. During that interrogation, Powdrill was severely beaten. The owner was a retired veteran of the local police department, 889 F.2d at 456, and the township where the club was located had "[a]n official policy of deferring to private owners with respect to the investigation of crimes in private clubs." *Id.* at 458. Nevertheless, the owner did eventually call police. An officer, who had served on the police force with the owner, subsequently arrived, but the officer left Powdrill alone in the owner's custody noting that Powdrill was "in good hands"—despite observing blood and evidence of a beating. *Id.* at 456. After the officer left, Powdrill was

21

beaten again and subsequently died from his injuries. His estate brought an action against the municipality and the responding officer under § 1983. We held that the township could be liable because the jury could have found that the township had "delegated . . . its traditional police functions" to the owner of the club. *Id.* at 458. The responding officer "used his official status to confirm that [the owner] was free to continue the custodial interrogation even though Mr. Powdrill was in fear for his safety and wanted to leave." *Id.* Although we framed the precise issue there as whether or not Powdrill "was in state custody at the time of the fatal beating," *id.*, our inquiry focused on whether the defendant had so limited Powdrill's ability to act in his own interest as to create the special relationship required for constitutional liability. We explained:

> *DeShaney* requires that the state have imposed some kind of limitation on a victim's ability to act in his own interests. While specifically referring to imprisonment and institutionalization—the *Estelle* and *Youngberg* examples—the court acknowledges that other similar state-imposed restraints of personal liberty trigger a state duty to prevent harm.

*Id.*

Our finding of a special relationship in *Horton* also turned on the fact that the abuser there acted pursuant to delegated state authority.

> From the evidence the jury could find that New Kensington *delegated to [the owner] its traditional police functions* . . . . [A] state can be held responsible for a private action if the private actor has exercised coercive power with significant encouragement, overt or covert, from the state. The function of investigating crimes is clearly a governmental function. An official policy of deferring to private owners with respect to the investigation of crimes in private clubs, which the jury could have found from the evidence, suffices to permit a legal

22

conclusion that [the owner], maintaining custody over Mr. Powdrill, was exercising a delegated state function.

*Id.* (citations omitted).

The custody that the plaintiff in *Horton* was subjected to when he was fatally beaten was thus akin to the state's custody over prisoners. The township had ceded its police authority to detain and interrogate to the club owner. The control a school has over its students does not begin to approximate the restriction of freedom of movement and isolation from possible assistance that existed in *Horton* or other cases prescribed by *DeShaney* and its progeny.

Despite our dissenting colleagues' suggestion that the school's passivity here amounted to affirmative conduct, there is no assertion that Anderson acted under authority delegated by the school or that she "exercised coercive power with significant encouragement . . . from" the school. *See id.* In fact, Anderson was disciplined for her conduct. Although the school's response may well have been as inadequate as it was unfair to the Morrow children, the school certainly did not give Anderson or her confederate the authority to harass or bully the Morrow children. We therefore see no conflict between our analysis here and our analysis in *Horton*.

In reaching this conclusion, we reiterate that we both appreciate the Morrows' concerns and that we are sympathetic to their plight. Parents in their position should be able to send their children off to school with some level of comfort that those children will be safe from bullies such as Anderson and her confederate. Indeed, the increasing prevalence of the kind of bullying alleged here has generated considerable discussion and legislative action. *See T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d 289, 297-98 (E.D.N.Y. 2011) (discussing the problem of school bullying in the United States).[17] Nonetheless, "the Constitution does

---

[17] *See also* Jackie Calmes, *Obamas Focus on Antibullying Efforts*, N.Y. Times, Mar. 10, 2011, *available at* http://www.nytimes.com/2011/03/11/us/politics/11obama.htm

23

not provide judicial remedies for every social . . . ill." *Lindsey v. Normet*, 405 U.S. 56, 74 (1972). Given the limitations of *DeShaney*, and the language in *Vernonia*, it is now clear that the redress the Morrows seek must come from a source other than the United States Constitution.

Our dissenting colleagues take us to task for expressing concern for the Morrows' plight without providing a remedy and suggest that the very fact that we are troubled by the result counsels in favor of a constitutional remedy. *See* Fuentes Dissent 2 ("The Morrows are today left without a legal remedy for these actions. That future victims may seek relief from State legislatures is of no help to them. We do not adequately discharge our duty to interpret the Constitution by merely describing the facts [of these cases] as 'tragic' and invoking state tort law.") (internal citation and quotation marks omitted) (alteration in original); Ambro Partial Concurrence and Partial Dissent 1 ("I share Judge Fuentes' concern that failing to hold a school accountable for violence done to students creates an incentive for school administrators to pursue inaction when they are uniquely situated to prevent harm to their students.").

However, "the due process clause is not a surrogate for local tort law or state statutory and administrative remedies." *Hasenfus v. LaJeunesse*, 175 F.3d 68, 74 (1st Cir. 1999). Nor is "[s]ubstantive due process . . . a license for judges to supersede the decisions of local officials and elected legislators on such matters." *Id.*

Obviously, neither our holding here nor the Supreme Court's jurisprudence forecloses states from providing public school students and their parents with personally enforceable remedies under state law. We realize that Pennsylvania's courts have held that school districts are "the beneficiaries of immunity pursuant to the [Political Subdivision Tort Claim]

---

l. In light of the growing problem of school bullying, 49 states, including Pennsylvania, *see* 24 Pa. Cons. Stat. § 13-1303.1-A, have now passed anti-bullying laws. U.S. Dep't of Health & Human Servs., *Policies & Laws*, www.stopbullying.gov/laws/index.html (last visited Jan. 7, 2013).

Act" (now codified at 42 Pa. Cons. Stat. § 8541) and are not subject to "tort liability . . . when students are injured in the course of the school day, even if, assuming arguendo, there was negligence on the part of the school officials." *Auerbach v. Council Rock Sch. Dist.*, 459 A.2d 1376, 1378 (Pa. Commw. Ct. 1983). However, state legislatures retain the authority to reconsider and change such restrictions in order to better respond to the kind of bullying that happened here and that appears to be all too pervasive in far too many of today's schools. *See T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d at 297-98.

For the reasons we have explained, we cannot fashion a constitutional remedy under the special relationship theory based on the facts alleged in this case.

## B.  State-Created Danger

The Morrows alternatively argue that the Defendants had a duty to protect Brittany and Emily because they created or exacerbated a dangerous situation. As we explained above, in *Kneipp v. Tedder*, 95 F.3d at 1201, we first adopted the state-created danger theory as a way to establish a constitutional violation in suits brought under § 1983. We confirmed that liability may attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process. *Kneipp*, 95 F.3d at 1205. To prevail on this theory, the Morrows must prove the following four elements:

1) the harm ultimately caused was foreseeable and fairly direct;

2) a state actor acted with a degree of culpability that shocks the conscience;

3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

25

4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (citations and internal quotation marks omitted).

The Defendants focus on the last prong of the test.[18] They argue that the Morrows have failed to allege any affirmative action by school administrators that made the Morrow children more vulnerable than they would have been had the administrators stood by and done nothing at all. The Morrows argue that the Defendants' affirmative act was suspending Anderson, and then implicitly inviting her to return to school following the suspension. In other words, the Morrows argue that by permitting Anderson to return to school rather than expelling her, school officials affirmatively used their authority to create a danger that Anderson would attack Brittany and Emily once again. The Morrows also point to the "affirmative act" of allowing Anderson to board the Morrow children's school bus, where Anderson threatened to attack Brittany.

We have explained that the line between action and inaction is not always easily drawn. "'If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.'" *Middle Bucks*, 972 F.2d at 1374 (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)). However, the Morrows' Complaint simply attempts to redefine clearly passive inaction as affirmative acts. *Cf. Sanford v. Stiles*, 456 F.3d 298, 311-12 (3d Cir. 2006) (holding that, where a high school guidance counselor failed to properly evaluate the sincerity of a student's comment to another student that he wanted to kill himself, she had not

---

[18] The Defendants claim that the Morrows cannot prove the first three prongs of the test either, but their primary focus is on prong four.

26

committed an affirmative act but rather failed to prevent his death).

We are not persuaded by the Morrows' argument that the Defendants affirmatively created or enhanced a danger to Brittany and Emily by suspending Anderson and then allowing her to return to school when the suspension ended. Although the suspension was an affirmative act by school officials, we fail to see how the suspension created a new danger for the Morrow children or "rendered [them] more vulnerable to danger than had the state not acted at all." *Bright*, 443 F.3d at 281. To the contrary, the suspension likely made the Morrows safer, albeit temporarily. In addition, the fact that Defendants failed to expel Anderson, or, as the Morrows would describe it, "*permitted*" Anderson to return to school after the suspension ended, does not suggest an affirmative act.

While the Morrows make much of the fact that Defendants' failure to expel Anderson after she was adjudicated "guilty of a crime" may have been contrary to a school policy mandating expulsion in such circumstances, we decline to hold that a school's alleged failure to enforce a disciplinary policy is equivalent to an affirmative act under the circumstances here.

The dissent argues that Defendants' failure to expel Anderson constitutes an affirmative "exercise of authority" that contributed to the danger the Morrows faced, thereby triggering a duty to protect. Under this reasoning, however, every decision by school officials to use or *decline to use* their authority, disciplinary or otherwise, would constitute affirmative conduct that may trigger a duty to protect. The dissent claims that "state authority necessarily brings with it discretion as to whether or not to take specific actions, and the decision to take one action over another—or to take no action at all—is itself an 'affirmative exercise of authority' that may carry serious consequences." Fuentes Dissent 24. Thus, were we to accept the dissent's formulation here, the state-created danger *exception* would swallow the rule. [19]

---

[19] Judge Ambro also makes a very forceful point in expressing a concern that "creating a constitutional tort out of

Schools would always be liable, under the Dissent's view, for any injury that could be linked to either action or inaction. Any and all failures to act would be transformed into an affirmative exercise of authority.

The Morrows also rely on the fact that the Defendants permitted Anderson to board Emily and Brittany's bus despite knowing about the no-contact orders against Anderson, and knowing that that bus did not service Anderson's home route. However, the only reasonable interpretation of that allegation is that the Defendants *failed* to take any affirmative steps to ensure that Anderson did not board the Morrow children's bus.[20] Here again, the Complaint attempts to morph passive inaction into affirmative acts. However, merely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct.

As Judge Ambro explains, the requirement of an actual affirmative act "is not intended to turn on semantics of act and omission. Instead, the requirement serves . . . to distinguish cases where . . . officials might have done more . . . [from] cases where . . . officials created or increased the risk itself." Ambro Partial Concurrence and Partial Dissent 1. We therefore hold that the Complaint also fails to state a cause of action under the state-created danger exception.

## IV. CONCLUSION

a school's failure to expel a student creates a too-easy incentive for schools to expel quickly students who engage in any violent behavior in order to avoid liability or the threat of suit." Ambro Partial Concurrence and Partial Dissent 3.

[20] For example, school authorities could have alerted the appropriate bus drivers of the no-contact orders against Anderson and given drivers a photograph of Anderson so they could identify her and prevent her from boarding the wrong bus.

For all the reasons set forth above, we will affirm the District Court's order granting the Defendants' Motion to Dismiss.[21]

---

[21] Because the Morrows cannot make out a claim under either the special relationship or state-created danger theories of constitutional liability, we need not address whether defendant Balaski should be afforded qualified immunity or whether the School District may be held liable as a municipal defendant.

SMITH, *Circuit Judge*, concurring.

I join Chief Judge McKee's well-reasoned majority opinion in its entirety. I write separately only to explain the limited circumstances under which I believe we may overrule one of our prior en banc decisions.

"Stare decisis should be more than a fine-sounding phrase." *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 394 (1977) (Marshall, J., dissenting). Yet it is nothing more than that if it does not require us, in the ordinary course, to adhere to a precedent with which we disagree. And even sitting en banc, we do not conduct a plenary re-examination of our prior decisions; we instead remain constrained by our precedent "to the degree counseled by principles of stare decisis." *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 813 (3d Cir. 1991) (en banc). Indeed, "even in constitutional cases" such as this one, the doctrine of stare decisis "carries such persuasive force" that departing from it has "always required" some "special justification." *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984).

According to the Supreme Court, those justifications must be nothing short of "exceptional."[1] *Randall v. Sorrell*,

---

[1] This is not to say that courts never encounter longstanding precedent that must be consigned to the dustbin of history. The clearest example is *Plessy v. Ferguson*. In *Plessy*, the Supreme Court concluded that state-mandated racial segregation in educational facilities could satisfy equal protection as long as the facilities were physically equivalent. *Plessy v. Ferguson*, 163 U.S. 537, 551 (1896). The Court did

1

so largely because it rejected the argument that enforced segregation laws were intended to "stamp[] [blacks] with a badge of inferiority." *Id.* The next sixty years of experience, however, directly disproved this premise, showing that separate-but-equal facilities nonetheless had the effect of creating unequal educational opportunities based on race. *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 493–95 (1954) ("Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority."). Such experience justified—indeed, required— the Court to correct its clearly erroneous interpretation of the purpose behind the enforced segregation laws and overrule *Plessy*. *See id.* at 495.

A less egregious example of precedent that was rightly discarded is *Dr. Miles Medical Co. v. John D. Park & Sons Co.* In *Dr. Miles*, the Supreme Court held that vertical price agreements between a manufacturer and its distributors were *per se* antitrust violations. 200 U.S. 376, 407–08 (1911). The Court reasoned that such vertical agreements were economically analogous to unlawful horizontal agreements among competing distributors because vertical agreements always tended to restrict competition and decrease output. *Id.* at 408. Nearly a century later, though, the Supreme Court recognized the "differences in economic effect between vertical and horizontal agreements, differences the *Dr. Miles* Court failed to consider." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889 (2007). With the "economic literature [] replete with procompetitive justifications" for vertical price agreements between

2

548 U.S. 230, 244 (2006) (quoting *Rumsey*, 467 U.S. at 212). If its precedent's reasoning was clearly wrong, then stare decisis loses some (though not all) of its force. *See Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("Whether or not we would agree with *Miranda*'s reasoning and its resulting rule[] were we addressing the issue in the first instance, the principles of stare decisis weigh heavily against overruling it now."); *see also McDonald v. City of Chi., Ill.*, 130 S. Ct. 3020, 3050 (2010) (Scalia, J., concurring) ("Despite my misgivings about Substantive Due Process as an original matter, I have acquiesced in the Court's incorporation of certain guarantees in the Bill of Rights because it is both long established and narrowly limited." (quotation marks and citation omitted)). Perhaps a prior case has become unworkable—that is, newly discovered facts have undermined the case's reasoning, subsequent legal developments have unmoored the case from its doctrinal anchors, or "experience has [otherwise] pointed up the precedent's shortcomings." *Pearson v. Callahan*, 555 U.S. 223, 233 (2009); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887–88 (2007). And if the precedent is particularly recent and has not generated any serious reliance interests, the rigging controlling the sails of stare decisis carries additional slack. *See, e.g.*, *Citizens United v. FEC*, 130 S. Ct. 876, 912–13 (2010); *Montejo v. Louisiana*, 556 U.S. 778, 793 (2009).

As other courts of appeals have concluded, these same considerations should guide our own stare decisis analysis.

manufacturers and distributors, the Supreme Court properly overruled *Dr. Miles. Id.*

3

*United States v. Burwell*, 690 F.3d 500, 504 (D.C. Cir. 2012) (en banc) (applying the Supreme Court's stare decisis factors in deciding whether to overrule a previous case); *United States v. Sykes*, 598 F.3d 334, 338 (7th Cir. 2010) (same); *United States v. Heredia*, 483 F.3d 913, 918–19 (9th Cir. 2007) (en banc) (same); *Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 310 (2d Cir. 2007) (en banc) (same); *Glazner v. Glazner*, 347 F.3d 1212, 1216 (11th Cir. 2003) (en banc) (same); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 575 (Fed. Cir. 2000) (en banc) (same), *overruled on other grounds by* 535 U.S. 722 (2002); *Stewart v. Dutra Constr. Co., Inc.*, 230 F.3d 461, 467 (1st Cir. 2000) (same), *overruled on other grounds by* 543 U.S. 481 (2005); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1137–38 (5th Cir. 1995) (en banc) (same); *McKinney v. Pate*, 20 F.3d 1550, 1565 n.21 (11th Cir. 1994) (en banc) (same).

None of these special justifications are present here.

*Middle Bucks*'s interpretation of the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196–97 (1989), was correct at the time it was decided. *DeShaney* held that substantive due process does not confer a right to state protection except when the state affirmatively acts to restrict a person's "freedom to act on his own behalf, through imprisonment, institutionalization, or other similar restraint of personal liberty." *Id.* at 200. In *D.R. v. Middle Bucks Area Vocational Technical School*, we interpreted "other similar restraint of personal liberty" to require total and involuntary state custody with no access to private assistance. 972 F.2d 1364, 1371 (3d Cir. 1992) (en banc) ("Institutionalized persons are wholly

4

dependent upon the state for food, shelter, clothing, and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs. Obviously, they are not free to leave."). We then concluded that, unlike prisoners and institutionalized individuals, students are not rendered totally dependent on the state just because the state requires them to attend school. *Id.*

The reasonableness of that interpretation of *DeShaney*'s state-restraint requirement is self-evident. To be sure, the *Middle Bucks* dissent viewed *DeShaney*'s state-restraint requirement more expansively to reach not only custodial restraints such as incarceration and involuntary institutionalization but also situations in which an individual faces "substantial [state] compulsion." *Id.* at 1379 (Sloviter, J., dissenting). But compared to incarceration and institutionalization, substantial state compulsion is not a "*similar* restraint of personal liberty": a state can substantially compel a person without "so restrain[ing] [his] liberty that it renders him unable to care for himself" while "fail[ing] to provide for his basic human needs." *DeShaney*, 489 U.S. at 200. Even if, as the majority notes, "the Supreme Court's jurisprudence [at the time of *Middle Bucks*] allowed room to debate this issue," Majority Op. at 13, the very point of stare decisis is to forbid us from revisiting a debate every time there are reasonable arguments to be made on both sides. *Agostini v. Felton*, 521 U.S. 203, 235 (1997) (explaining that stare decisis reflects "a policy judgment that 'in most matters it is more important that the applicable rule of law be settled than that it be settled right'" (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (Brandeis, J.,

5

concurring))). *Middle Bucks*'s reasoning was not so clearly wrong that we may—or should—cast it aside.

And that is especially true when one considers the limited nature of en banc review. En banc review is primarily reserved for correcting and maintaining consistency in panel decisions involving difficult and important questions of law. Fed. R. App. P. 35(a); *see, e.g.*, *United States v. Games-Perez*, 695 F.3d 1104, 1124 (10th Cir. 2012) (Gorsuch, J., dissenting from the denial of rehearing en banc) ("[S]urely it is uncontroversial to suggest that the point of the en banc process, the very reason for its existence, is to correct grave errors in *panel* precedents when they become apparent . . . ." (emphasis added)); *Pfizer, Inc. v . Apotex, Inc.*, 488 F.3d 1377, 1380–81 (Fed. Cir. 2007) (Newman, J., dissenting from the denial of rehearing en banc) ("The function of en banc hearings . . . is not only to eliminate intra-circuit conflicts, but also to correct and deter *panel* opinions that are pretty clearly wrong." (emphasis added) (internal quotation marks and citations omitted)). We do not sit en banc to "reopen settled issues which have already been given en banc treatment" absent intervening developments undermining our earlier decision. *Igartua v. United States*, 654 F.3d 99, 100 (1st Cir. 2011) (Lynch, J., concurring in the denial of en banc review); *see also McKinney*, 20 F.3d at 1565 n.21 ("[T]his is the first time this court sitting en banc has addressed this issue; thus, the implications of stare decisis are less weighty than if we were overturning a precedent established by the court en banc."). Absent such exceptional intervening developments, the "essence of stare decisis is that the mere existence of [*Middle Bucks*] becomes a reason for adhering to [its] holding[] in subsequent cases." *United States v. Reyes-*

6

*Hernandez*, 624 F.3d 405, 412 (7th Cir. 2010) (internal quotation marks and citations omitted).

Intervening legal and factual developments have only strengthened our decision in *Middle Bucks*. Since then, the Supreme Court has sharply circumscribed substantive due process, limiting its protections to only those "carefully described," unenumerated rights that are "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty.'" *Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)); *see also Dist. Att'y's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (refusing to recognize a liberty interest protected by due process unless it is "so rooted in the traditions and conscience of our people as to be ranked as fundamental" (internal quotation marks and citation omitted)).

It can hardly be said that "neither liberty nor justice would exist," *id.*, by forgoing a judicially enforceable right against the states to protect students from private harm. History points the other way. Under the doctrine of *in loco parentis*, states have long permitted schools to exercise control over students on the theory that parents delegated part of their parental authority to the schools during the school day. *See, e.g.*, 24 Pa. Cons. Stat. § 13-1317. "[S]choolteachers and administrators had almost complete discretion to establish and enforce the rules they believed were necessary to maintain control over their classrooms"— discretion that the "judiciary was reluctant to interfere" with. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 383, 398 (2009) (Thomas, J., concurring) (internal quotations

7

and citations omitted); *see also D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Dirs.*, 868 A.2d 28, 33 (Pa. Commw. Ct. 2004) (noting that "local school boards have broad discretion in determining school disciplinary policy" and that a court may not act as "a 'super' school board" by "substituting its own judgment for that of the school district"); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 481 (1982) ("No single tradition in public education is more deeply rooted than local control over the operation of schools . . . ." (quoting *Milliken v. Bradley*, 418 U.S. 717, 741 (1974))).  Faced with a tradition that once permitted almost no judicial limitations on schools' disciplinary authority, *id.* at 416, I cannot conclude that substantive due process enshrines the opposite—a right to judicial intervention in school disciplinary decisions.  The "mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it." *Osborne*, 557 U.S. at 72 (internal quotation marks and citation omitted).

Just as the constriction of substantive due process has bolstered *Middle Bucks*'s vitality, there are no new factual developments that undermine the decision's reasoning.  To be sure, a body of intervening research has revealed that school bullying undeniably causes serious harm to its victims.  This evidence, however, has no bearing on *Middle Bucks*'s two-part rationale.  First, the severity of harm caused by bullying is irrelevant to *Middle Bucks*'s constitutional judgment that substantive due process is not triggered by substantial state compulsion.  *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 860 (1992) (acknowledging that "time has overtaken some of [*Roe v. Wade*'s] factual assumptions" about when a fetus is viable and when abortions are safe for the mother, but concluding that these developments "have no

8

bearing" on the "soundness or unsoundness of [*Roe*'s] constitutional judgment" that "viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions"). After all, substantive due process "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).

Second, empirical revelations about bullying's effects do not change *Middle Bucks*'s factual judgment that compulsory education laws fall short of making students wholly dependent on the state. If anything, students are subjected to less state compulsion today than at the time of *Middle Bucks*. With increased availability of private schooling, homeschooling, private tutoring, online and distance education, and charter schools, modern families have more options to satisfy the compulsory school laws. And school authority over students has significantly eroded in favor of parental control and private sources of assistance. *See New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985) ("More generally, the Court has recognized that the concept of parental delegation as a source of school authority is not entirely consonant with compulsory education laws. Today's public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies." (internal quotation marks and citations omitted)). The most serious disciplinary problems are handled by police officers and the legal system, not school administrators and the disciplinary code. *See, e.g.*, *In re R.H.*,

9

791 A.2d 331 (Pa. 2002); *Commonwealth v. Williams*, 749 A.2d 957 (Pa. Super. Ct. 2000). States no longer permit schools to inflict corporal punishment. *See, e.g.*, 22 Pa. Code § 12.5(a). And so forth.

Students these days also have the protection of state tort laws that did not exist when we decided *Middle Bucks*. Nearly every state has enacted anti-bullying laws since we decided *Middle Bucks*, showing that our decision has not prevented states from experimenting with their own solutions to the problems of bullying. There is "no institutional need to send judges off on [a] 'mission-almost-impossible'" to prevent and cure the effects of school bullying when legislators "are able 'to amass the stuff of actual experience and cull conclusions from it.'" *McDonald*, 130 S. Ct. at 3128 (Breyer, J., dissenting) (quoting *United States v. Gainey*, 380 U.S. 63, 67 (1965)). "To suddenly constitutionalize this area would short-circuit what looks to be a prompt and considered legislative response." *Osborne*, 557 U.S. at 73. If the people of Pennsylvania, Delaware, New Jersey and the Virgin Islands want to expose their schools to greater liability for inaction, or if they desire different solutions to the problem that all on this en banc court agree bullying to be, it is their prerogative to do so. *Middle Bucks* does not stand in their way.

In fact, Pennsylvania, like many other states, has deliberately chosen not to make schools and other local government agencies liable for claims like the Morrows'. Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. §§ 8541–42; *see Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006) (per curiam) (explaining that local state

10

agencies, including school districts, are "given broad tort immunity" under the Pennsylvania Political Subdivision Tort Claims Act); *Tackett v. Pine Richland Sch. Dist.*, 793 A.2d 1022, 1025 (Pa. Commw. Ct. 2002) (holding that the Pennsylvania Political Subdivision Tort Claims Act immunized a school district from liability where a teacher's alleged failure to supervise students' chemistry experiment caused an explosion and severely burned a student); *Auerbach v. Council Rock Sch. Dist.*, 459 A.2d 1376, 1378 (Pa. Commw. Ct. 1983) (holding that the Political Subdivision Tort Claims Act immunized a school district from liability for student-on-student injuries, even if school district allegedly failed to protect the victim or supervise the attacker); *Husser v. Sch. Dist. of Pittsburgh*, 228 A.2d 910, 910–11 (Pa. 1967) (holding that a school district was entitled to governmental immunity for a student's on-campus mugging even if school officials knew of "similar criminal acts [that had] occurred with great frequency . . . in the months immediately prior to the attack" and took no precautionary measures). And of course, state law usually provides victims with the ability to sue and recover from bullies who assault, inflict emotional distress on, or commit other torts against fellow students and from the parents whose negligent care allow the bullies to do so. *See* Restatement (Second) of Torts §§ 283A (discussing children's tort liability), 316 (discussing a parent's tort liability for negligently controlling his child); *see, e.g.*, *Condel v. Savo*, 39 A.2d 51, 53 (Pa. 1944) (permitting a tort action against parents who "kn[e]w of the habit of their child of striking other children with sticks" and took "no steps to correct, or restrain" the child).

11

Lastly, even though *Middle Bucks* is only two decades old, schools have come to rely on it in developing their personnel and behavioral policies. Schools have long operated under a regime in which they have no affirmative federal duty to protect students from private violence during the school day. There is no reason to upset these expectations by imposing an amorphous, judicially created standard that raises more questions than it answers—especially when states have proven themselves capable of addressing the problem of bullying. *Osborne*, 557 U.S. at 74 ("It is hard to imagine what tools federal courts would use to answer [such questions]. . . . [T]here is no reason to suspect that their answers to these questions would be any better than those of state courts and legislatures, and good reason to suspect the opposite."); *McDonald*, 130 S. Ct. at 3101 (Stevens, J., dissenting) ("Another key constraint on substantive due process analysis is respect for the democratic process. If a particular liberty interest is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate."). Abruptly reversing course would require precisely the sort of "extensive legislative response" that stare decisis aims to avoid. *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991) (noting that stare decisis "has added force" when the legislature has relied on a previous decision in such a way that overruling that decision would "require an extensive legislative response").

It comes as no surprise, then, that *Middle Bucks* is no "legal anomaly" deserving of abandonment. *Randall*, 548 U.S. at 244. Aside from the Second and D.C. Circuits, which have not considered the issue, all other courts of appeals have

12

held that compulsory school attendance, coupled with schools' authority over their students, does not trigger the protections of substantive due process. *Doe v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 858 (5th Cir. 2012) (en banc); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 968–69, 972–74 (9th Cir. 2011); *Stevenson v. Martin Cnty. Bd. of Educ.*, 3 F. App'x 25, 27, 30–31 (4th Cir. 2001); *Hasenfus v. LaJeunesse*, 175 F.3d 68, 69–72 (1st Cir. 1999); *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 563, 568–70 (11th Cir. 1997); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 731–34 (8th Cir. 1993) (involving an intellectually disabled high school boy assaulted by another intellectually disabled student); *Maldonado v. Josey*, 975 F.2d 727, 728, 729–33 (10th Cir. 1992); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 268, 272–73 (7th Cir. 1990). It is "rarely appropriate to overrule circuit precedent just to move from one side of the conflict to another," *United States v. Corner*, 598 F.3d 411, 414 (7th Cir. 2010) (en banc), and no "compelling basis" warrants our creating a conflict here where none exists, *Wagner v. PennWest Farm Credit, ACA*, 109 F.3d 909, 912 (3d Cir. 1997) ("In light of such an array of [unanimous] precedent [from seven other courts of appeals], we would require a compelling basis to hold otherwise before effecting a circuit split."); *Butler Cnty. Mem'l Hosp. v. Heckler*, 780 F.2d 352, 357 (3d Cir. 1985) ("[T]his Court should be reluctant to contradict the unanimous position of other circuits.").

In short, nothing convinces me that "adherence to [*Middle Bucks*] puts us on a course that is sure error." *Citizens United*, 130 S. Ct. at 911–12. Departing from

13

*Middle Bucks* would create a circuit split in exchange for forsaking the Supreme Court's repeated reluctance against expanding substantive due process. *See NASA v. Nelson*, 131 S. Ct. 746, 756 n.10 (2011). That, to me, is a lose-lose proposition.

AMBRO, <u>Circuit Judge</u>, concurring in part and dissenting in part

I share Judge Fuentes's concern that failing to hold a school accountable for violence done to students creates an incentive for school administrators to pursue inaction when they are uniquely situated to prevent harm to their students. For that reason, as well as the others in Judge Fuentes's exceptional opinion, I wholeheartedly join Part I of the dissent, and would hold that a special relationship exists between the School and its students.

But I cannot agree that the facts of this case demonstrate a cause of action under our state-created danger theory. The majority concludes that the School's decision not to expel Anderson is a failure to act and one that did not render the Morrows more susceptible to danger. I agree, but think we must delve further. Thus, while I join that part of the Court's judgment, I write separately on this issue.

The fourth requirement of our state-created danger claim is that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006). This test, I believe, is not intended to turn on the semantics of act and omission. Instead, the requirement serves an important purpose: to distinguish cases where government officials might have done more to protect a citizen from a risk of harm in contrast to cases where government officials created or increased the risk itself. Following violence, suffering, and/or death of one of our citizens, we often wish that a state actor with the authority to do so had intervened. We are not comforted by concluding that officials failed to act when we could just as easily say that they affirmatively decided to do something. But we are

1

limited by the protection afforded by the Constitution and the Supreme Court's holding in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) ("[A] State's failure to protect an individual . . . simply does not constitute a violation of the Due Process Clause."). We have recognized a narrow exception to *DeShaney*'s rule: a constitutional remedy may exist when a government actor creates or increases the risk to a citizen. *Id.* at 201; *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996).

Judge Fuentes makes the most compelling case possible: "it may be inferred from the Complaint that the School did do something" by deciding to suspend rather than expel Anderson, and then continuing to keep her in school despite repeated acts of violence, criminal adjudication, and a disciplinary code that directed expulsion. Fuentes Dissent 26. But the context of the School's decision—the prior violence, the no-contact order, the disciplinary code, and the ability to protect the Morrows by expelling Anderson—are factors relevant to the School's special relationship with the Morrows. I do not believe we can consider these factors to deem the School's behavior a creation of risk. The School acted no differently in failing to protect a vulnerable member of society from harm than defendants in cases where no state-created danger exists, including *DeShaney*. 489 U.S. at 201 (risk of abuse suffered by four year old left in the care of his father was not created by social workers who had previously removed him and returned him to the home); *Sanford v. Stiles*, 456 F.3d 298, 311–12 (3d Cir. 2006) (high school student's risk of suicide not caused or increased by guidance counselor who met with him twice); *Bright*, 443 F.3d 276 (risk of attack not created by police who failed to arrest attacker after he violated parole).

Holding that the School's actions—or lack thereof—in this case were sufficient to plead a state-created danger claim

would substantially broaden this narrow exception. *DeShaney* is grounded in constitutional law, but has an important practical effect too. Federal courts cannot be the forum for every complaint that a government actor could have taken an alternate course that would have avoided harm to one of our citizens. I also worry that creating a constitutional tort out of a school's failure to expel a student creates a too-easy incentive for schools to expel quickly students who engage in any violent behavior in order to avoid liability or the threat of suit.

The special relationship theory, which is far more circumscribed, does not present this same risk. Accordingly, I concur in part and dissent in part.

FUENTES, *Circuit Judge*, with whom Judges Jordan, Vanaskie, and Nygaard join, and with whom Judge Ambro joins as to part I, dissenting:

Over the course of several months, minors Brittany and Emily Morrow (the "Morrows") suffered repeated physical and verbal assaults at the hand of a bully and her friend, classmates in their public school in the Blackhawk School District in Pennsylvania (the "School" or "Blackhawk").[1] The attacks included racially motivated assaults, verbal harassment of the Morrows in their home and on-line, attempting to push Brittany down a flight of stairs during school hours, and violent physical assaults on the Morrows at a School football game and on a school bus. Early on in this history of attacks, the bully was charged by the authorities with assault and making terroristic threats, was eventually placed on probation by the Court of Common Pleas, and was ordered to have no contact with Brittany. School officials were aware of these proceedings and had even suspended the bully for a brief period before she was

---

[1] This appeal comes to us following the District Court's dismissal pursuant to Rule 12(b)(6). Therefore, all that is required is that the Complaint "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 230 (3d Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). "[W]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).

1

placed on probation.  Nevertheless, the bully was readmitted to School and some of the instances of violence described above occurred after her return.  Eventually, the bully was adjudicated a juvenile delinquent and was again ordered to have no contact with Brittany.  It also bears noting that many of the bully's attacks occurred after Blackhawk officials had suspended the Morrows themselves for their involvement in the dispute, pursuant to the School's "No Tolerance Policy."  It is reasonable to infer that, to the Morrows, application of the policy (which could have led to their permanent expulsion from the School) meant that they risked disciplinary action should they act to forestall attacks by the bully.  Despite all this, Blackhawk officials refused to protect the Morrows from danger.  When the Morrows sought help, they were told that the School would not guarantee their safety and, surprisingly, that their best course of action would be to find another school.

The Morrows are today left without a legal remedy for these actions.  That future victims may seek relief from State legislatures, Majority Op. at 23-25, is of no help to them.  "We do not adequately discharge our duty to interpret the Constitution by merely describing the facts [of these cases] as 'tragic' and invoking state tort law."  *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 886-87 (5th Cir. 2012) (en banc) (Weiner, J., dissenting) (citing *Maldonado v. Josey*, 975 F.2d 727, 735 (10th Cir. 1992) (Seymour, J., concurring)).

Worse, today's result is wrong as a matter of law.  The legal and factual relationship between students and school officials during the school day, the coercive power that the state exercises over school children, and the role of the school

2

officials in this case in placing the Morrows in greater danger, all dictate a result contrary to that reaffirmed and endorsed today.

## I. The Existence of a "Special Relationship" Between The Morrows And Blackhawk School Officials

Twenty years ago, a narrow majority of this Court decided in *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992) (en banc), that school officials have no obligation to protect school children from any physical harm that may occur during school hours. Close analysis of the reasoning in *Middle Bucks*, however, shows that its entire legal basis was a misunderstanding of the Supreme Court's seminal decision in *DeShaney v. Winnebago County Social Services*, 489 U.S. 189 (1989), and of the relationship between the State and school children.

Reconsidering the coercive power that the State exercises over students, and the ways in which the State may restrict a student and his or her parents' ability to protect that student from harm, we would conclude, like Judge Becker in *Middle Bucks*, that a special relationship may exist under certain narrow circumstances. *See Middle Bucks*, 972 F.2d at 1384 (Becker, J., dissenting). As pertains to this case, we would hold that Blackhawk undertook a limited obligation to keep the Morrows safe from harm at the hands of the bully because Blackhawk compelled school attendance, exercised extensive control over not only the student victims but also the specific threat at issue in the case—a violent bully subject to two restraining orders that victimized the Morrows over an extended period of time—and enforced school policies that

3

prevented the Morrows from being fully able to protect themselves.

## A.

As the majority outlines, in *DeShaney* the Supreme Court held that the Due Process Clause of the Fourteenth Amendment did not impose on the State of Wisconsin a blanket affirmative duty to interfere with the parental relationship between Randy DeShaney and his son Joshua, and that therefore the State was not liable for harm the child suffered or was likely to suffer at the hands of his father. 489 U.S. at 195-96. The Court noted that an affirmative duty to protect arose only if there was a "special relationship" between the State and the imperiled individual, and that the State's actions in taking temporary custody of Joshua and later returning him to his father, who was known to be abusive, were insufficient to give rise to such a relationship. *Id.* at 197-198.

The *DeShaney* Court referred to two cases that exemplify when a State enters into a special relationship. In *Estelle v. Gamble*, the Court had held that the Eighth Amendment imposed a duty to provide "adequate medical care" to prisoners given that they were unable to procure such care on their own "by reason of the deprivation of [their] liberty" by the State. *Id.* at 198-99 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). And in *Youngblood v. Romeo*, the Court extended *Estelle*'s holding to require States to provide "involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." *Id.* at 199 (quoting *Youngblood v. Romeo*, 457 U.S. 307, 314-325 (1982)).

4

Three years later, in *Middle Bucks*, we held that a "special relationship" did not exist between the State and school children, despite Pennsylvania's compulsory education laws. 972 F.2d at 1371-73. As the majority recognizes today, the crux of our holding in *Middle Bucks* is that although the State exercises *in loco parentis* authority over children during school hours, the parents "remain the primary caretakers" over their children. *Id.* at 1371. In other words, *Middle Bucks'* central premise is that a student, unlike a prisoner or the involuntarily committed, is not subjected to "full time severe and continuous state restriction." *Id*.

But *Middle Bucks* provides no basis to conclude that *DeShaney* endorses an all-or-nothing approach that turns on the existence of "round-the-clock" physical custody or on who remained the primary caregiver. *See id.* at 1379 (Sloviter, C.J., dissenting). Were the existence of either fact dispositive in *Estelle*, *Youngblood*, or even *DeShaney* itself, the Supreme Court surely would have said so explicitly. Instead, the Court explained that the common thread that unites *Estelle* and *Youngblood* is that a person is left "unable to care for himself" by the "State's affirmative act of restraining the individual's freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200. The Court contrasted these situations to Joshua's case by noting that returning Joshua to his father's care did not constitute a restraint on his liberty to act on his own behalf. *Id.* The result in *DeShaney* is also explained by other facts, none of which turns on the lack of permanent physical custody: (1) that the "harms Joshua suffered occurred not while he was in the State's custody;" (2) that the State "played no part in [the] creation" of the

5

danger; and (3) that the State did not do "anything to render [Joshua] any more vulnerable." *Id.* at 201.[2]

Because *DeShaney* itself did not provide the *Middle Bucks* majority with the absolute physical custody requirement, it relied on our prior decision in *Philadelphia Police* to conclude that *DeShaney* "set[] out a test of physical custody." *Middle Bucks*, 972 F.2d at 1370 (citing *Philadelphia Police & Fire Ass'n v. Philadelphia*, 874 F.2d 156, 167 (3d Cir. 1989)). *Philadelphia Police* had held that the State is not responsible for harm suffered by mentally handicapped individuals living at home, but it neither requires absolute physical custody nor turns on who the primary caregiver was. *See Philadelphia Police*, 874 F.2d at 167.

---

[2] Moreover, the duty assumed in *Estelle* was commensurate with the restriction the State had imposed on the individual's liberty: a prisoner is restrained from seeking medical help on his own, so under *Estelle* the State must provide it. *DeShaney*, 489 U.S. at 198-99 (citing *Estelle*, 429 U.S. at 103-104). *Estelle* does not recognize a generalized duty to protect prisoners from *all* harm, despite the fact that prisoners are under the permanent physical custody of the State. And the only gloss on *Youngblood* provided in *DeShaney* was to note that because the mentally committed were less culpable than the incarcerated and "may not be punished at all," the State takes upon itself a duty, broader than in *Estelle*, to keep such individuals safe. *Id.* at 199 (citation omitted). This analysis suggests that the Court favored a more nuanced look at the relationship between the individual and the State, certainly one more flexible than the rigid test of *Middle Bucks*.

6

Indeed, the case arguably implies that the State *could* be held liable for harm suffered by the individual while in temporary State custody. To be sure, *Philadelphia Police* and *DeShaney* foreclose any argument that the State is responsible for the safety of school children while in their own homes. But *Philadelphia Police* does not bridge the gap between *DeShaney* and an "absolute physical custody" requirement. Thus, it is clear that *Middle Bucks*' gloss on *DeShaney* has no doctrinal foundation.[3]

---

[3] *Middle Bucks*' absolute physical custody requirement and its focus on who remains the victim's primary caregiver also contrast sharply with our holding in *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989). In *Horton*, we held that a special relationship existed between the employees and the proprietors of a nightclub, who had been delegated law enforcement authority by the local police, and that there was a duty to protect an employee from harm while he was in the temporary physical custody of the owners. *Id.* at 458. Although we sat *en banc* in *Middle Bucks*, the *Middle Bucks*' majority's failure to address *Horton*'s interpretation of *DeShaney* is significant. "[R]eturning to the intrinsically sounder doctrine established in prior cases may better serve the values of *stare decisis*." *Citizens United v. Fed. Election Comm'n*, 130 S.Ct. 876, 920 (2010) (Roberts, C.J., concurring) (quotation marks and citation omitted). We do not suggest that there is a "conflict" between today's analysis and *Horton*. *See* Majority Op. at 23. *Horton* merely illustrates that *Middle Bucks*' absolute physical custody requirement was ill-advised and doctrinally unfounded.

**B.**

As the Supreme Court has observed, "[t]he State exerts great authority and coercive power through mandatory attendance requirements." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987). Reexamining the relationship between school children and the State in light of our understanding of *DeShaney* leads to the inescapable conclusion that a special relationship may exist under certain specific circumstances.

In Pennsylvania, attending school is obligatory for children between the ages of eight and seventeen. 24 Pa. Stat. Ann. §§ 13-1326, 1327(a). Parents who fail to comply with these mandates face punishment as severe as imprisonment. *Id.* §1333(a)(1).[4] Once the State compels attendance, it has considerable power over the child's well-being as a matter of both law and fact. Pennsylvania's *in loco parentis* statute gives school officials "the same authority as to conduct and behavior over the pupils attending . . . school . . . as the[ir] parents." *Id.* § 13-1317. And "[t]he rights and liabilities arising out of an *in loco parentis* relationship are . . . exactly the same as between parent and child." *T.B. v. L.R.M.*, 786 A.2d 913, 916-17 (Pa. 2001). This may be an understatement. A parent may punish a child for "incorrigibility," but he may not, like the State, initiate juvenile delinquency proceedings. 24 Pa. Stat. Ann. § 13-1338.

---

[4] The State's first intrusion into the lives of its citizens in the school context may be considered to be when it enrolls all parents as the funders of public schools via taxation.

8

It is true that parents retain the ultimate legal custody and responsibility over the child. But a parent's immediate ability to protect his child is significantly curtailed during the time the child is in the physical custody of school officials. During that time, the State may well be the *only* caregiver to which children may turn to for help. *Middle Bucks* attempted to dilute the strength of this reasoning by noting that it cannot "be denied that a parent is justified in withdrawing his child from a school where the health and welfare of the child is threatened." 972 F.2d at 1371 (quoting *Zebra v. Sch. Dist. of Pittsburgh*, 296 A.2d 748, 751 (Pa. 1972)). But this overlooks that this right is extremely narrow, limited to situations in which a child's safety is "positively and immediately threatened." *Commonwealth ex rel. Sch. Dist. of Pittsburgh v. Ross*, 330 A.2d 290, 292 (Pa. Commw. Ct. 1975). In *Ross*, a parent *could not* withdraw a student although the child had been pushed into a wall and cut with scissors by other students. *Id.* at 291. And in *Zebra*, a parent could not withdraw his child even though he was threatened with physical harm "if any reports were made to the school authorities" regarding a bully's extortion attempt, and "[m]any of the . . . students became ill, developed nervous conditions, required medical treatment, [and] were afraid while attending [the school]." *Sch. Dist. of Pittsburgh v. Zebra*, 287 A.2d 870, 872 (Pa. Commw. Ct. 1972), order reversed by *Zebra*, 296 A.2d 748. Thus, a Pennsylvania parent appears not to be free to withdraw a child absent the most egregious conditions. Indeed, "[m]ost parents, realistically, have . . . little ability to influence what occurs in the school." *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring).

9

The State's authority over children while they are in school extends beyond their well-being and is nearly absolute, covering what they may wear and how they may behave. *See generally* 24 Pa. Stat. Ann. § 13-1317.3; 22 Pa. Code § 12.2 (detailing student responsibility to engage in "conscientious effort in classroom work and homework"). Officials may "proceed against said child before the juvenile court" for misbehavior. 24 Pa. Stat. Ann. § 13-1338. At thirteen, the child is also subject to penalties for failure to comply with compulsory school laws. *Id*. § 13-1333(b).[5]

The Blackhawk Student Handbook reflects these restrictions on students' liberty and on their parent's ability to act on the child's behalf, and goes further by regulating student conduct in classrooms, school buses, cafeterias, and sporting activities; providing that students missing class will be required to attend the School for detention on Saturdays and that officials "may consider corporal punishment" upon a student; and prohibiting students from having cell phones. *See* Blackhawk High School Student Handbook "Statement of Student Behavior," *available at* http://blackhawk.bhs.schoolfusion.us/modules/cms/pages.pht

---

[5] That these measures are "inherent in the nature of the relationship of public schools and their pupils," Majority Op. at 16, is of no moment. *See also id.* at 15. Restrictions on liberty are also "inherent" in the relationship between the State and the imprisoned or involuntarily committed, but the significance of such restrictions is not diminished by the fact that the State has a vested and even necessary power to impose them.

ml?pageid=41593 (hereinafter "Handbook"); *see also* 24 Pa. Stat. Ann. § 13-1317.[6]

In *DeShaney*, the State simply left Joshua where it found him; he was not harmed while in the State's physical custody or by anyone or anything over which the State had any immediate authority. Here, by contrast, the State affirmatively removed the children from their parents' custody for a period of time, limited what both the children and the parents could do respecting the children's safety during that period, and exercised control over a continuous threat the children faced over an extended period of time. This is enough to hold that a special relationship existed between the School and the Morrows. But if more were needed, one may look at cases involving the special relationship between the State and children it places in foster care.

---

[6] Given the prohibition against students carrying means of communicating with their parents during school hours, which in 1992 represented a ban on pagers, it is obviously difficult, if not practically impossible, for a student to seek help from a parent during school hours. *Middle Bucks* largely overlooked this. 972 F.3d at 1372 (noting that "channels for outside communication were not totally closed" during school hours). Contrary to the majority's suggestion, we do not question the wisdom of school policies aimed at student safety or discipline, *see* Majority Op. at 17 n.14, and we doubt schools will change any policies to avoid liability under the narrow circumstances described here. But we look to those policies to better understand the nature of the relationship between students and the State.

Since *Middle Bucks*, several Courts of Appeals have answered the question left open by the Supreme Court in *DeShaney* regarding the existence of a special relationship between the State and the children it places in foster homes. *See* 489 U.S. at 201 n.9. These courts have held that a special relationship exists in such cases because the State, in placing a child in foster care, "renders the individual substantially dependent upon the state . . . to meet [his or her] basic needs." *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000) (en banc) (quotation marks and citation omitted); *see also Lintz v. Skipski*, 25 F.3d 304, 305 (6th Cir. 1994); *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir. 1992).

Our own case, *Nicini*, involved a child who was not in the State's absolute care but was placed in a foster home. The child's parents had signed a foster care placement agreement with the State, and the State permitted the child to stay on a temporary basis with another family, the Morras, after the child ran away from home. The child sued the State on the theory that it had failed to sufficiently investigate the Morras, whom he alleged sexually abused him. Although we "recognize[d] that the analogy between foster children . . . and prisoners and institutionalized persons" from *Estelle* and *Youngblood* was "incomplete," and that foster children "enjoy a greater degree of freedom and are more likely to be able to take steps to ensure their own safety," we held that a special relationship existed because the child was effectively in State

custody and was "substantially dependent" on the State for his safety. 212 F.3d at 808 (quotation marks omitted).[7]

*Nicini* thus "discredit[s]" not just the "underlying reasoning" of *Middle Bucks*, but also its reading of *DeShaney*. *Citizens United*, 130 S. Ct. at 921 (Roberts, C.J., concurring) (explaining that "*stare decisis* does not control" when the "underlying reasoning" of precedent in question has been "discredited"). *Nicini* makes clear that physical custody cannot be the lynchpin of a *DeShaney* special relationship because the child there was not under the State's control at the time the harm occurred. Moreover, the State in *Nicini* was not the primary caregiver. As the D.C. Circuit has recognized, the result and reasoning in the foster care cases have thus created "tension [with the] public school cases"

---

[7] *Middle Bucks* places some emphasis on the fact that schools do not restrict a child's ability to provide for his *basic* needs, *see Middle Bucks*, 972 F.2d at 1372, but this is not the proper rubric of analysis under *DeShaney*. The State did not restrict the individual's ability to provide for his basic needs in *Youngblood* or in the foster care cases. The individual's ability to do so was restricted by circumstances over which the State had no control and in which it played no part. At most, the State undertook some responsibility when it stepped into the lives of such individuals. So too in the school context. Minors are unable to provide for their basic needs without their parents on account of age. By compelling attendance in school, the State does not alter that reality, but does temporarily curtail a parent's ability to be a caregiver, thereby undertaking that responsibility—albeit a more limited one—in the same way it does in *Youngblood* and *Nicini*.

because "[b]oth involve state constriction of a child's liberty . . . yet only the former triggers *DeShaney* custody." *Smith v. District of Columbia*, 413 F.3d 86, 96 (D.C. Cir. 2005). And *Smith* itself demonstrates that the fact that children return to their parents at the end of the school day is not dispositive. There, the Court held that a State has a special relationship with juvenile delinquents the State places in an "independent living" youth program, but over which it exerts neither absolute physical control nor supervision. *See id.* at 94.[8]

Moreover, not only do these cases provide reason to revisit the legal underpinning of *Middle Bucks*, they provide further support for holding that a special relationship exists in this case. Here, unlike in *Nicini* or *DeShaney*, the State had custody of the children at the time of the injury in question, and the children were "substantially dependent" on the State for their safety during school hours, despite the existence of other caregivers. *Nicini*, 212 F.3d at 808 (quotation marks omitted). Like the children in *Smith*, the Morrows were technically free to "come and go" from school after certain hours but "risk[ed] punishment" for "fail[ing] to obey [the State's] restrictions on [their] . . . freedom" while in school.

---

[8] Indeed, even though a student returns home after the school day, the State may continue to exercise some control over some of the student's activities. *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011) (addressing propriety of school action under the First Amendment). If students have a cause of action under § 1983 against school administrators who attempt to discipline them for out-of-school internet postings as we held in *J.S.*, then surely students also have a cause of action against school administrators who fail to protect them from in-school harms.

14

*Smith*, 413 F.3d at 94. If anything, the existence of a special relationship is clearer here than in *Nicini* because the State in this case had physical custody over both the victim and the aggressor and was thus uniquely positioned to protect the child from harm. Neither factor existed in *Nicini* or in *DeShaney*. Fairly read, the additional element of control that existed in the relationship between the State and Nicini that did not exist in *DeShaney* is that in *Nicini* the State entered into a temporary agreement with Nicini's parents pursuant to which the parents consented to have their son placed in foster care. More is present here. Compulsory schooling laws, together with the restrictions on parents' and their children's ability to free themselves from State control, arguably impose on the State a greater obligation here than that which it undertook in *Nicini*.

The majority seizes on the temporary nature of the student/State relationship and also attempts to distinguish *Nicini* and *Smith* on the ground that parents remain the primary caregivers over school children. But this fact does not negate that during school hours the State has the "immediate [] responsibility for the child's wellbeing." *Nicini*, 212 F.3d at 808. In our view, this fact demonstrates, at most, that the difference between the State's relationship with the *Nicini* children and schoolchildren is a difference in degree, not kind, and suggests that the proper course is to impose a constitutional duty on schools only under limited circumstances. *See Middle Bucks*, 972 F.2d at 1384 (Becker, J., dissenting). In *Middle Bucks*, Judge Becker found the existence of a special relationship based on the state's compulsory attendance laws, the student's disability, and the "affirmative steps [the school took] to confine the student to situations where she was physically threatened." *Id.* Under

15

the circumstances before us—Pennsylvania's compulsory schooling laws, the existence of the restraining orders that prohibited contact between the bully and the Morrows, the fact that the School had custody and control over the very threat that harmed the Morrows, and the enforcement of the "No-Tolerance" Policy, all suggesting that the Morrows' ability to protect themselves was limited—we "have no difficulty deciding" that a special relationship arose between the School and the Morrows. *Id.*

Restrictions on a person's liberty to protect him- or herself from danger are the lynchpin of *DeShaney*. *See* 489 U.S. at 199-201. An approach that abandons *Middle Bucks'* doctrinally unsound requirements and focuses on whether a State substantially restricted a student's ability to defend herself from a particular danger, in addition to the general restraints on liberty imposed by compulsory schooling laws, is therefore more in line with *DeShaney* and simply makes more sense. Adopting such an approach and considering the specific circumstances of this case, we would hold that the Complaint has adequately pled the existence of a special relationship between the Morrows and the School vis-à-vis the bully, and remand the case for discovery on that claim.[9]

---

[9] I would also note that, in the school context, children are placed under State control for the undeniably important goal of "prepar[ing] them] for citizenship in the Republic." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986) (citation omitted). This restraint on the liberty of students is justified by the State's own overarching interest in education.

In addition, if it is unconstitutional to confine in unsafe conditions the mentally infirm, then surely it must be

16

## C.

Today's majority does not quarrel with the foregoing or fully reject the dissenters' reasoning in *Middle Bucks*. Majority Op. at 11-12 (instead calling the *Middle Bucks* dissent "compelling"). Nevertheless, the Court refuses to revisit *Middle Bucks*, asserting that the matter has been settled by *dictum* in a decision of the Supreme Court. But neither that comment nor principles of *stare decisis* preclude us from revisiting *Middle Bucks* or control the outcome of this case.

## 1.

In *Vernonia School District 47J v. Acton*, the Supreme Court upheld under the Fourth Amendment a school policy requiring athletes to submit to drug tests. The Court relied on the lowered expectations of privacy that students have in schools, because they are "committed to the temporary custody of the State." 515 U.S. 646, 654 (1995). The Court commented that it did not mean to "suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" *Id.* at 655 (citing *DeShaney*, 489 U.S. at 200). Seizing on this language, the majority concludes that "it is difficult to

unconstitutional to refuse to protect from harm school children whose liberty the State restricts on its own accord. *See DeShaney*, 489 U.S. at 199 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional . . . to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." (citation omitted)).

17

imagine a clearer or more forceful indicator of the Court's interpretation of its holding in *DeShaney*." Majority Op. at 13.

But the *Vernonia dictum* cannot bear the great weight the majority places on it.[10] Simply put, this case is not a "general matter." *Vernonia*, 515 U.S. at 655. The School administrators here had custody of a bully, who was prohibited from contact with Brittany Morrow by *two* court

_____

[10] That is particularly true because much of the *dicta* in *Veronia* that both precedes and follows the language quoted by the majority points in the opposite direction. In framing the degree of control that public school officials exercise over their students, the Court began with the premise that "unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e.*, the right to come and go at will." 515 U.S. at 654. The Court also noted that it had "rejected the notion that public schools . . . exercise only parental power over their students," a "view of things" that it said is "not entirely consonant with compulsory education laws." *Id.* at 655 (internal quotation marks omitted). And the Court "emphasized[] that the nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults," *id.*, following its passing reference to *DeShaney* with a recitation of the various ways in which "school authorities ac[t] *in loco parentis*" and a statement that the nature of constitutional freedoms enjoyed by students "is what is appropriate for children in school." *Id.* at 655-56 (internal quotation marks omitted).

orders. Despite the State's knowledge of a very specific, continuing, and serious threat against a particular student, the School failed to prevent subsequent attacks and instead took action against the victims themselves pursuant to the "No Tolerance Policy." When faced with a specific request for help, the School told the Morrows that it could not offer assistance, and even suggested it would be best if they, not the bully, left and attended another school.

To be sure, we do not "lightly ignore" Supreme Court *dicta*, Majority Op. at 13, and the *Vernonia dictum* undoubtedly "invites some caution," *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 (1st Cir. 1999). But we also ought not to stretch *dicta* beyond the specific question it controls, so as to curtail constitutional rights. While the *Vernonia dictum* precludes us from holding that school districts have as "a general matter" a duty to protect students, it does not foreclose finding a special relationship under specific circumstances.[11]

### 2.

Nor do we lightly suggest that our precedent be overturned. But even assuming that the same *stare decisis* concerns that cabin the Supreme Court's discretion to revisit its own precedent apply with equal force to the Courts of

---

[11] Notably, one of the decisions by our sister Circuits cited by the majority specifically refuses to read the *dictum* in *Vernonia* to preclude finding a special relationship in the school context under *all* circumstances. *See Hasenfus*, 175 F.3d at 71-72.

19

Appeals, those principles do not stand in the way of revisiting *Middle Bucks*.

We should revisit *Middle Bucks* because its underlying premise, that the special relationship test turns on the existence of permanent physical custody, was clearly erroneous and set our jurisprudence astray from the contours of the special relationship test. *See supra* Part I.A. The fact that the majority does not defend the outcome of *Middle Bucks* as standing on its own suggests that the decision remains sufficiently controversial as to counsel "a greater willingness to consider new approaches capable of restoring our doctrine to sounder footing." *Citizens United*, 130 S. Ct. at 922 (Roberts, C.J., concurring). Even the Supreme Court, when it "has confronted a wrongly decided, unworkable precedent calling for some future action . . . [,] ha[s] chosen . . . to overrule the precedent." *Payne v. Tennessee*, 501 U.S. 808, 842-43 (1991) (Souter, J., concurring).[12]

---

[12] Moreover, *Middle Bucks* has been subject to criticism. *See, e.g.*, Deborah Austern Colson, Note, *Safe Enough to Learn: Placing an Affirmative Duty of Protection on Public Schools under 42 U.S.C. § 1983*, 30 HARV. C.R.-C.L. L. REV. 169, 183, 196 (1995) (denouncing "mechanical" analysis of the relationship between students and school officials, and suggesting that we should "make case-by-case, fact-intensive inquiries into state action"); Robert C. Slim, Comment, *The Special Relationship Doctrine and a School Official's Duty to Protect Students from Harm*, 46 BAYLOR L. REV. 215 (1994); Case Comment, *Third Circuit Finds No Affirmative Duty of Care by School Officials to Their Students*: D.R. v. Middle Bucks Area Vocational Technical School, 106 HARV. L. REV. 1224 (1993).

In addition, although the record before us on this question is bare, one might also argue that at least some factual developments since *Middle Bucks* have further undercut its rationale and provide additional reasons to reexamine it.  The proper question is whether *Middle Bucks'* assumptions about the level of control that schools exert over students have been challenged.   There are now abundant examples of schools exercising greater control over students, ranging from technology tracking student movements at all times to ensure they are in class, *see* Maurice Chammah and Nick Swartsell, *Student IDs That Track the Students*, N.Y. TIMES, OCT. 6, 2012, http://nyti.ms/ThvbFq, to monitoring online social media activity within and outside school premises, *see, e.g.*, *J.S..*, 650 F.3d at 915, and, in the wake of recent tragic school shootings, locking classrooms in further restriction of student movement.  *See, e.g.*, Stephen Ceasar and Howard Blume, *To lock classroom doors or not?*, LOS ANGELES TIMES, Jan. 13, 2013, http://soc.li/2N96T3f (noting increase in locked classrooms in the wake of the Newtown, Connecticut shootings, and how such measures have resulted in other problems such as an instance of a teacher sexually assaulting students).[13]  *Stare decisis* does not require us to

---

[13] We do not contend that the limitations on students' freedoms are comparable to those imposed on prisoners or the involuntarily committed.  *See* Majority Op. at 14-15.  The examples do show, however, that the relationship between school children and the State is far more intrusive than the relationship between Joshua DeShaney and the social services department, and that in some ways the relationship restricts the freedom of students, as a factual matter, more so than the relationship between the State and the children in *Nicini* and *Smith*.

definitively settle the questions raised by these new circumstances, nor does it preclude us from revisiting *Middle Bucks* while sitting *en banc*.

## II. Blackhawk May Have Also Created the Danger That Harmed The Morrows

The Morrows also argue that the School may be liable under the "state-created danger" theory.[14]  The majority concludes that this cause of action must also be dismissed because the Morrows have failed to plead an "affirmative act" by the School.  Majority Op. at 26-27.  Although we have acknowledged that "the line between action and inaction may not always be clear" in the context of these kinds of claims, *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 282 (3d Cir. 2006), the consequence of that line becomes sadly clearer with the Court's decision in this case: administrators who let violence run rampant can take shelter under the label "inaction."  Dereliction of duty becomes a school's best defense.  This outcome is contrary to an appropriate understanding of the state-created danger doctrine.  Indeed, although the doctrine represents a narrow exception to *DeShaney*, the majority narrows the exception to the vanishing point by saying that school officials are free to ignore court orders and their own disciplinary code, enabling a pattern of physical abuse to persist.

---

[14] We and other Circuits derived this theory from the Supreme Court's statement in *DeShaney* that "[w]hile the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation." 489 U.S. at 201.

To prove a state-created danger, a plaintiff must demonstrate that:

(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* at 281 (quotation marks and citations omitted). The first and third elements are not in dispute in this case.[15] We therefore discuss the second and fourth elements to

---

[15] The first prong is satisfied by the two court orders directing the bully to have no contact with the Morrows, which were delivered to the School, because the threat posed by the bully was both "foreseeable" by the School and "fairly direct" as to the Morrows. The third prong is satisfied because the assignment of the Morrows to Blackhawk under the compulsory school attendance law made them part of a "discrete class of person subject to the potential harm" brought about by the School's conduct.

demonstrate that the Morrows' complaint adequately pleads this cause of action.[16]

## A.

The second prong of the state-created danger test sets "deliberate indifference" as "[t]he level of culpability required to shock the conscience . . . in cases where deliberation is possible and officials have time to make unhurried judgments." *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006) (quotation marks omitted). The "deliberate indifference" formulation applies here because the decision with respect to the bully and the Morrows was neither "split-second" nor made in a "matter of hours or minutes," *id.* at 310 (citation omitted), but rather was made and sustained over eight months stretching from January to October 2008.

In addition, the Complaint here supports an inference of deliberate indifference on the part of the School principal, Balaski. Balaski knew that the bully was not permitted to contact the Morrows. Moreover, the Handbook mandates some action by officials in response to students who commit "Level IV" offenses, which include assault and battery, and

---

[16] Because, as noted, this case comes to us from a ruling on a motion to dismiss, we must draw all reasonable inferences in the Morrows' favor. *Monroe*, 536 F.3d at 205. If, based on the facts pled in the Morrows' Complaint, "we cannot reasonably conclude at this juncture of the case that the harm . . . came about by means apart from the state," *Middle Bucks*, 972 F.2d at 1382 (Sloviter, C. J., dissenting), the Morrows should have the opportunity for discovery to determine the precise nature of the School's conduct.

24

arguably calls for their expulsion. However, Balaski ignored the import of the no-contact orders and decided not to abide by the school's own Disciplinary Code. His decisions are alleged to have put the bully in proximity to and contact with the Morrows, despite ample reason to believe the bully would continue to assault the Morrows. Consequently, they have adequately pled deliberate indifference and satisfied the second prong of the state-created danger theory.

**B.**

Under the fourth prong of the theory, "liability . . . is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriment in terms of exposure to danger."[17]

---

[17] It is worth noting that *DeShaney* does not actually compel the inclusion of the "affirmative act" requirement into the fourth element of the state-created danger test. When we first considered the state-created danger theory, we said that *DeShaney* holds "that a state's failure to take affirmative action to protect a victim from the actions of a third person will not, in the absence of a custodial relationship between the state and the victim, support a civil rights claim." *Brown v. Grabowski*, 922 F.2d 1097, 1100-01 (3d Cir. 1990). However, *DeShaney* used the phrase "affirmative act" only to refer to state conduct sufficient to create a special relationship. *See, e.g.*, *DeShaney*, 489 U.S. at 200. By contrast, in contemplating the possibility of a state-created danger, the Court simply suggested that the State must have "played [some] part" in the creation of that danger. *Id.* at 201. Much like the requirement that the State have absolute physical custody in the context of the special relationship test, the "affirmative act" element is our own addition, and one

*Bright*, 443 F.3d at 282 (quoting *Middle Bucks*, 972 F.2d at 1374). But it is not easy to discern from our cases what constitutes an affirmative act and what does not.

In *Kneipp v. Tedder*, we held that there was a substantive due process violation when police stopped an intoxicated couple on the street and then permitted the wife to go home alone, resulting in her fall down an embankment and ultimate death. 95 F.3d 1199, 1211 (3d Cir. 1996). Then, in *Rivas v. City of Passaic*, we held liable emergency medical technicians ("EMTs") who told police officers that a man in the midst of a seizure had assaulted them but did not inform the officers of the man's medical condition. 365 F.3d 181, 195 (3d Cir. 2004). We said that the state had created a danger in *Kneipp* because the defendants "used their authority as police officers to create a dangerous situation or to make [the victim] more vulnerable to danger [than] had they not intervened." 95 F.2d at 1209. In *Rivas*, we aggregated an earlier action (the EMTs' call that brought the police) with the inaction that was the actual cause of harm (the failure to inform the police of the victim's condition) and decided it was sufficient because such sequence "created an opportunity for harm that would not have otherwise existed." 365 F.3d at 197.

As these cases demonstrate, virtually any action may be characterized as a failure to take some alternative action or vice-versa. *See, e.g.*, *Covington Cnty.*, 675 F.3d at 864, 866 (describing the police officers in *Kneipp* as having "sent" the victim home alone, but recasting parents' allegation that a

that is not necessarily helpful to safeguarding constitutional rights.

26

school released their child to an unauthorized person in violation of school policy as a "failure to adopt a stricter policy").[18]

Moreover, any conduct pled as the source of a state-created danger is likely to include a combination of action and inaction, depending on how far back in the causal chain a court goes. *See Bright*, 443 F.3d at 291 (Nygaard, J.,

---

[18] We also struggled with the "action/inaction" determination in *Middle Bucks* when we distinguished two cases in which the state indisputably created a danger by a failure to act. The first case was *Horton*, where a club owner empowered by the police to act as law enforcement beat up one of his employees while interrogating him about an alleged theft. The club owner then called a police officer who failed to remove the employee from the club owner's custody, despite evidence of severe physical mistreatment. We held that the police officer was potentially liable. *See Horton*, 889 F.2d at 458. In the other case, a minor was committed to a foster home based on a charge of assault and battery upon her father. The state later learned, but failed to disclose, the fact that the parents had fabricated the assault charge. The First Circuit held that the state was liable because its failure to disclose the false charge resulted in continued custody of the daughter in foster homes and other placements. *See Germany v. Vance*, 868 F.2d 9 (1st Cir. 1989). We distinguished those cases from *Middle Bucks*, in which we held that a failure to act did not support a state-created danger claim, because we "read both cases to turn upon a finding of 'functional' custody," 972 F.2d at 1375, that we believed did not exist in *Middle Bucks*, but we provided no justification for that distinction.

dissenting) ("By cabining Bright's claim based *solely* on an ensuing delay in taking action, the majority lops off the initial affirmative act so it can conclude that there was no affirmative act."). Indeed, in *Kneipp* and *Rivas*, the immediate harm to the victims was due to the defendant's failure to act. Therefore, the better way of understanding these cases, contrary to the majority's embrace of the "affirmative act" requirement today, is to recognize that "the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 915 (3d Cir. 1997).[19]

---

[19] Given that, as noted, the "affirmative act" requirement is not actually present in *DeShaney*, it is not surprising that we have not always required an "affirmative act" as part of the fourth prong of the state-created danger test. As Judge Nygaard noted in *Bright*, "[s]ince *Kneipp* . . . enunciated our state-created danger test, not one of our cases [had] inserted the word 'affirmatively' into the fourth element of the test" prior to *Bright*. 443 F.3d at 288 (Nygaard, J., dissenting). Rather, we consider whether "the state actor used his authority to create an opportunity for danger that otherwise would not have existed." *Kneipp*, 95 F.3d at 1208; *see generally Bright*, 443 F.3d at 288 (Nygaard, J., dissenting) (collecting cases). Judge Nygaard rightly observed in *Bright* that these cases "shifted away from inquiring into the existence of affirmative acts as a standard to establish the fourth element of our test for a compelling reason: to so hinge our inquiry would center us squarely in the troublesome decisional thicket governing the distinction between action and inaction." *Bright*, 443 F.3d at 289.

The majority in *Bright* suggested that there is "no conflict" between the "use of authority" and "affirmative act" formulations of the fourth prong of the state-created danger test because "state actors cannot use their authority to create . . . an opportunity [for injury to the plaintiff] by failing to act." 443 F.3d at 283 n.6 (quotation marks omitted). But that statement is wrong both linguistically and logically. It is wrong linguistically because authority is a broader concept than action. *See Ye v. United States*, 484 F.3d 634, 639-40 (3d Cir. 2007) (treating "affirmative action" as a specific instance of the "exercise of authority"). And it is wrong logically because state authority necessarily brings with it discretion whether to take specific actions, and the decision to take one action over another—or to take no action at all—is itself an "affirmative exercise of authority" that may carry serious consequences. In many, if not most, state-created danger cases, the state actor will have made a decision to act in the context of some set of policies. For example, police departments have procedures with respect to the enforcement of restraining orders, and their enforcement decisions must be viewed in the context of those policies. *See, e.g.*, *Sheets v. Mullins*, 287 F.3d 581, 589 (6th Cir. 2002) (considering sheriff's liability in the context of court-mandated process for restraint orders); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir. 1990) (considering whether police chief interfered with standard police procedures with respect to enforcement of restraint order).

The exercise of authority by school officials must similarly be viewed in the context of policies and procedures whose express purpose is to protect students while they are under school control. If a school exercises its authority to contravene a policy designed to protect students, then "the

29

school officials' role [is] not merely passive or simply negligent." *Covington Cnty.*, 675 F.3d at 882 (Wiener, J., dissenting). It cannot rightly be said of a school's decision to exercise its authority to violate or suspend a policy that would protect a student that "it placed [that student] in no worse position than that in which he would have been had [the state] not acted at all."[20] *DeShaney*, 489 U.S. at 201. As we said in *Middle Bucks*, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." 972 F.2d at 1374 (citation omitted). The majority's argument that our view of the state-created danger exception threatens to "swallow the rule," Majority Op. at 26, ignores the key role played by school disciplinary policies, as well as other policies that cabin officials' discretion, in our formulation of the state-created danger exception.

---

[20] One might argue that holding public schools liable under the state-created danger theory based on their own protective policies creates an incentive to eliminate or weaken those policies. However, those policies are typically mandated by the State. For example, Pennsylvania requires that each school "adopt a code of student conduct that includes policies governing student discipline." 22 Pa. Code § 12.3(c). Also, under its "Safe Schools" statute, Pennsylvania requires each school to have a policy relating to bullying that must be incorporated into its code of student conduct and disciplinary code. 24 Pa. Stat. Ann. § 13-1303.1-A(a). Moreover, we doubt that any rational school district will opt for eliminating policies designed to protect children, and permit teachers to abandon children to danger, simply to avoid liability in egregious cases such as this.

Ultimately, the misguided effort to equate "affirmative act" and "exercise of authority" begs the real question at issue: whether a state actor increased the risk someone faced. Regardless of whether a state-created danger requires either an "affirmative act" to place an individual in danger or an "exercise of authority" that renders him more vulnerable to danger, the facts pled in the Complaint, accepted as true, together with the reasonable inferences we are required to draw, satisfy either standard.

While the majority reasons there was no affirmative act on the part of the School, it may be inferred from the Complaint that the School did do something. Principal Balaksi engaged in decision-making as to the implementation of a provision of the Disciplinary Code. The Disciplinary Code states that Level IV offenses "are clearly criminal in nature and are so serious that they *always require administrative action resulting in the immediate removal from school*." Compl. ¶ 16 (emphasis added). Therefore, it may be reasonably inferred that the School affirmatively exercised its discretion to permit the bully to return to school after she was adjudicated a delinquent and made the subject of the two no-contact orders. Moreover, the School conceded at oral argument that the principal could have initiated the hearing process that would have been necessary prior to permanently expelling the bully from the School, but that he did not do so. Consequently, it is fairly inferable from the Complaint that there were internal discussions that preceded the decision to decline enforcement of the Disciplinary Code against the bully. Those discussions, and that decision, put the Morrows

31

at a heightened risk of harm and satisfy the fourth element of the state-created danger test.[21]

The majority's conclusion to the contrary turns on its assumption that the bully would have continued to attend school had she not been suspended. *See* Majority Op. at 26-27. But this is plainly incorrect in light of the Disciplinary Code that obligated School officials to do something about the bully's continued criminal behavior after her return from school. Without explanation, the majority "decline[s] to hold that a school's alleged failure to enforce a disciplinary code is equivalent to an affirmative act." *Id.* at 27. Precisely because, in choosing to ignore that mandate, the School officials contributed to the danger the Morrows faced, we would reach the opposite conclusion.

## C.

Like *Kneipp*, this case presents "unique facts," 95 F.3d at 1208, that distinguish it from *Middle Bucks* and set it apart from the majority of state-created danger cases that we have

---

[21] One might also reasonably infer that the School officials affirmatively acted in a way that increased the danger to the Morrows by putting them and the bully in the same lunch room or allowing the bully to board the Morrows' school bus despite the fact that it did not serve her home route. *See, e.g.*, Compl. ¶ 18. The School argues that the incident on the school bus cannot constitute the basis of liability because the Morrows were less restrained by the School when they were on the bus. This argument confuses the physical restraint component of the special relationship test with the state-created danger theory.

seen. In *Middle Bucks*, where the question was "extremely close," 972 F.2d at 1374, we held that, "[a]s in *DeShaney*, 'the most that can be said of the state functionaries . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.'" *Id.* at 1376 (quoting *DeShaney*, 489 U.S. at 203). But the high school principal here, Balaski, was not confronted with "suspicious circumstances." He was confronted with a student who had been charged with assault and making terroristic threats and harassment, had been adjudicated a delinquent, had repeatedly attacked the Morrows over the course of several months, and had been the subject of two no-contact orders that were delivered to the School. And Balaski's decisionmaking did not occur in a vacuum but instead operated under a Disciplinary Code and an Anti-Bullying Policy that the School was required to adopt by the Pennsylvania legislature. *See supra* note 20. In *Middle Bucks*, we said that the defendants "did not subject plaintiffs to an inherently dangerous environment," 972 F.2d at 1375, but, here, Balaski's decision not to expel the bully unquestionably subjected the Morrows to an inherently dangerous environment. This is evidenced by his own statement to the Morrows' parents that the school "could not guarantee the safety" of their daughters. Compl. ¶ 20. The Morrows should therefore be permitted to take their state-created danger cause of action past the pleadings stage.

## III. Conclusion

It has been suggested that the "elephant in the room" in cases of this nature is a desire by the federal courts to avoid becoming the forum for all disputes involving everyday schoolyard quarrels. *See, e.g.*, *Middle Bucks*, 972 F.3d at

33

1384 (Sloviter, C.J., dissenting); Oral Arg. Audio Tr. 26:39-27:08 (Ambro, J.). But there exist sufficient evidentiary and procedural protections to assuage any concerns that a limited review of *Middle Bucks* will open the floodgates to all school-related litigation. *See Middle Bucks*, 972 F.2d at 1384 (Sloviter, C.J., dissenting). And to plead a plausible special relationship cause of action, the student must clear another hurdle by pointing to other circumstances beyond the restraints imposed ordinarily by compulsory schooling laws. Run-of-the-mill schoolyard fights, isolated or random acts of violence, or matters where a school played no part in exacerbating the threat, would likely not be covered.

But regardless of the efficacy of these devices, we ought not refuse to grant relief that is warranted simply to stem future litigation. While turning away the Morrows may be convenient as a matter of management of judicial resources or as a matter of school policy, it is neither expedient nor sound as a matter of constitutional law. The majority avers that students and concerned parents may seek redress from their legislatures, but concedes that the law as it exists today, at least in Pennsylvania, immunizes schools from such suits. *See* Majority Op. at 25 (citing *Auerbach v. Council Rock Sch. Dist.*, 459 A.2d 1376, 1378 (Pa. Commw. Ct. 1983)). Perhaps students may seek redress under other federal statutes for certain instances of pervasive or race-motivated harassment.[22] But these limited remedies will not

---

[22] *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) (permitting cause of action to proceed against school district under Title VI for permitting plaintiff to be bullied on account of race); *Shore Regional High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194 (3d Cir. 2004) (recognizing claim

be available for all cases, and we should not require that the level of attacks reach frightening extremes before school officials are required to intervene. "When claims like these fall through the cracks, § 1983 seems less than the powerful tool to vindicate constitutional rights it was designed to be." *Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 715 (3d Cir. 1993) (Scirica, J., concurring).

Most ironically, today's victory may be pyrrhic for school officials. To the detriment of schools' ability to manage their own affairs, concerned parents could seek greater control and awareness over the moment-to-moment safety of their children, knowing that the school officials to whom they entrust their children are under no legal obligation to protect them from harm. Some parents may even take unilateral acts to protect their children. *See, e.g.*, Ryan Raiche, *Parents of boy who brought butcher knife to school say it was to defend himself from bullies*, ABC Action News WFTS-TV, Jan. 14, 2013, http://shar.es/jEG8P. At worst, schools may be unwittingly encouraging the law of the jungle to be the reigning norm. We hope this is not the case.

It cannot be denied that schools both create and regulate the conditions to which students are subject during the school day. When a State interrupts even temporarily the

_____

against school based on the Individuals with Disabilities Education Act). Notably, the existence of alternative causes of action further undercuts implicit reliance on a desire to shield school officials from suits as a reason to depart from sound constitutional principles. Bullying-related suits will continue as long as the issue is in the public eye regardless of today's decision.

provision of care by a parent to a child, steps into the shoes of that parent, and restricts the ability of the child to defend herself from a specific threat, the State ought to be seen as incurring a narrow, concomitant responsibility to act as one would expect the child's parents to act: to protect the child from that danger. The School's explicit refusal to do so should give us more pause than it does today. Moreover, when a school official chooses not to remove a student who has committed violent acts against another student, despite policies that call for such removal, that official has surely placed the victim in a worse position than if the disciplinary policy had run its ordinary course. And when a school creates an atmosphere in which serious violence is tolerated and brings no consequence, it acts in a manner that renders all students more vulnerable.

We respectfully dissent.

Nygaard, *Circuit Judge*, dissenting.

      More than twenty years ago, we took up the troubling appeal of two female high school students who had been sexually assaulted by seven male students in a classroom, during a graphic arts class. *See D.R. v. Middle Bucks Area Vocational Technical School, et al.,* 972 F.2d 1364, 1366 (3d Cir. 1992). Despite compulsory education laws, we held that schools do not have an affirmative constitutional duty to protect students from the actions of third parties while they attend school. *Id*. at 1371-72.

      I joined several of my colleagues in dissenting from that decision. *Id*. at 1377 (Sloviter, J., dissenting). I believed then that the Appellants had stated viable constitutional claims against the school district. My position has not changed, and today, I would hold the same in this case. I therefore dissent.[1]

---

[1] My colleague, Judge Fuentes, has also written an opinion in dissent, which I agree with *in toto* and join.

1